**Robert L. MYER, Appellant**

v.

**AMERICO LIFE, INC., Appellee.**

**No. 05–06–01013–CV.**

Court of Appeals of Texas,
Dallas.

Aug. 30, 2007.

Peter E. Ferraro, Austin, for appellant.

Edwin R. DeYoung, Barbara M. Ellis, Locke Liddell & Sapp LLP, Dallas, for appellee.

Before Justices WRIGHT, RICHTER, and SMITH.[1]

## OPINION

Opinion by Justice RICHTER.

Robert L. Myer appeals the trial court's judgment confirming an arbitration award under the Federal Arbitration Act in favor of appellee Americo Life, Inc. Myer raises fourteen issues on appeal that generally argue the trial court erred when it refused to vacate the arbitration award because:

(1) the arbitration panel exceeded its authority; (2) the award was made in "manifest disregard" for the law; (3) the award failed to meet the "fundamental rationality" test; and (4) the award contravened public policy. Myer also contends there was no basis for the recovery of attorneys' fees because the entire award should have been vacated. Finding no reversible error, we affirm the judgement of the trial court.

## I. BACKGROUND

### A. The Underlying Transaction

In 1998, Myer agreed to sell several insurance-related companies he owned to Americo.[2] Americo acquired these assets for a purchase price of over $20 million dollars. In conjunction with the sale, the parties entered into a consulting agreement with a fifteen-year term. The stated purpose of the consulting agreement was twofold: (1) to retain Myer with respect to the marketing of life insurance and annuity products; and (2) to provide for Myer's agreement not to compete against Americo or any of its affiliates. The consulting agreement detailed these general objectives in nonsolicitation and noncompetition provisions. In essence, Myer agreed to provide consulting services if requested by Americo, to use his best efforts to achieve $515 million in qualifying production, and not to compete with Americo or solicit its agents, in exchange for which Americo agreed to pay Myer periodic payments.[3]

---

1. The Honorable Bea Ann Smith, Justice, Court of Appeals, Third District of Texas at Austin, Retired, sitting by assignment.

2. Americo purchased all of the outstanding capital stock of Pension Consultants & Administrators, Inc. and NAP Partners, Inc., all of the outstanding capital stock owned by Myer of College Insurance Group, Inc., and substantially all of the assets of Marketing Systems Group, Inc. and Great Southern Group, Inc.

3. Americo agreed to compensate Myer as follows: $75,000 upon execution and delivery of the agreement, $500,000 per year for the first five years of the agreement, and $150,000 per year for years six through ten of the agreement. For each year thereafter until 2013, Americo agreed to compensate Myer in an amount equal to the then existing Social Security wage base, but not to exceed $100,000 per year.

Although Myer agreed not to compete with Americo, there was an express carve-out for certain transactions with the Equita companies, a group of companies that market insurance for Americo. Myer is a 50% owner of the Equita companies. Rick Wolfe ("Wolfe") owns the remaining 50% interest. Under the carve-out, Myer was permitted to retain an ownership interest in the companies, but promised not to be actively involved in management other than as a Director, as Secretary, and as necessary to fulfill his fiduciary obligations in these capacities. Myer also agreed to use his best efforts to assure the Equita companies continued their relationships with Americo, and not to take any action that would cause the discontinuation of any relationship.

The consulting agreement contained an arbitration provision in which the parties agree to submit disputes to binding arbitration. Specifically, the consulting agreement provided:

> In the event of any dispute arising after the date of this agreement between Americo and Myer, the same shall be submitted to binding arbitration to the extent, and in the manner, described in Section 11.5 of the Purchase Agreement, which Section is incorporated herein by this reference.

Section 11.5 of the purchase agreement stated in pertinent part:

> (a) In the event of a dispute arising after the date of this Agreement with reference to any transaction contemplated by the Agreement ... or by any of the Transaction Documents among the parties hereto or thereto, the same shall be referred to three arbitrators for binding arbitration ...
> (c) the arbitration proceedings shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association. ...

The arbitration provision further required that the Panel's decision be made by a majority vote of two out of the three panel members and include detailed findings of fact and conclusions of law. Arbitration was to be conducted in Dallas, Texas or a location mutually agreeable to the parties.

The consulting agreement also contained a choice of law provision. Myer is a Texas resident and Americo is a Missouri corporation. The agreement acknowledged that a substantial portion of the services would be performed by Myer in Texas or another jurisdiction. Nonetheless, the parties agreed that any dispute would be governed by Missouri law.

## B. The Dispute

From 1998–2004, Americo made annual payments to Myer pursuant to the terms of the consulting agreement, but did not request that Myer provide any consulting services. The parties' dispute has its genesis in certain transactions which commenced in 2002.

The dispute centers around Financial Industries Corporation ("FIC"), a publicly-held company and competitor of Americo in the insurance products market. In 2002, Pat Tedrow ("Tedrow"), a friend and close business associate of Myer, approached Myer with a plan to acquire a substantial portion of FIC. To this end, Tedrow authored a marketing plan that was circulated to the FIC board of directors in 2003. The marketing plan was an exclusive arrangement which provided for Equita to market and sell insurance and annuity products for FIC affiliates. The grant to Equita of the marketing agreement was conditioned on the purchase of FIC stock.

Myer initially planned to purchase the FIC stock himself. But his attorney ad-

vised him that such a purchase would run afoul of the terms of the consulting agreement. Thereafter, an Equity affiliate company called M & W Insurance Services, Inc. ("M & W") acquired the FIC stock. M & W also entered into a marketing agreement with FIC which allowed Equita to place product with FIC.

Americo claimed that Myer actually negotiated the deal with FIC, and then arranged for Wolfe and the Equita company to assume his position and purchase the FIC stock. Americo asserted that Myer participated in the transaction, granted a security interest in personal assets to secure a loan for the stock purchase, guaranteed the loan, and arranged for the loan through his personal banking relationships. Americo also claimed Myer recruited R.A. Lotter, a top Americo agent, to work for FIC. According to Americo, these actions constituted a breach of the consulting agreement and of the duty of good faith and fair dealing.

Myer maintained his conduct did not contravene the provisions of the consulting agreement. Myer allowed Equita management to do what it thought best, and the FIC arrangement promised to be lucrative for Equita. According to Myer, this hands-off approach was consistent with the fiduciary duties he owed to Equita, and had he done otherwise, could have been challenged as interference with a corporate opportunity. Myer further maintained there was no impermissible competitive activity, and denied the solicitation of Americo agents.

### C. The Arbitration

In 2004, Americo initiated an arbitration proceeding against Myer seeking damages and injunctive relief based on Myer's alleged violation of the nonsolicitation and noncompetition provisions of the consulting agreement. After the parties selected an arbitration panel (the "Panel"), Myer filed a motion to stay the proceedings. The motion asserted Americo failed to give proper notice of its claim under the purchase agreement and that such notice was a condition precedent to arbitration. The Panel denied the motion.

On August 11, 2004, Myer initiated an action in the Dallas County district court. Myer then requested a stay of the arbitration. In support of his request for a stay, Myer initially argued the Panel lacked jurisdiction to determine the claim for injunctive relief. Myer subsequently amended to include the additional argument that Americo failed to give proper notice of the claim.

While the application to stay was still pending in the district court, Myer filed a motion for summary judgment in the arbitration proceeding. In the motion for summary judgment, Myer argued: (1) there was no proof of causation of any damages; and (2) the measure of damages was not recoverable at law because the remedy was in the nature of rescission, and rescission was not available unless there was a repudiation or total breach of the contract. After a hearing, the Panel denied the motion for summary judgment. The district court also denied the motion to stay. Thereafter, Myer non-suited the action in the district court.

In March and April 2005, the Panel conducted a hearing on the merits of the dispute. On June 8, 2005, after seven days of hearings, the Panel issued an award (the "Award") in favor of Americo. The Panel found that Myer violated the nonsolicitation and noncompetition provisions of the consulting agreement as well as the duty of good faith and fair dealing he owed to Americo under Missouri law. The Award was signed by two of the three arbitrators and contained detailed findings of fact and conclusions of law. The Award ordered

Myer to use his best efforts to cause M & W to divest itself of the FIC stock, and relieved Americo of the obligation to make payments to Myer under the consulting agreement until such divestiture is confirmed. Myer was also enjoined from further violations of the noncompetition and nonsolicitation provisions of the consulting agreement. The Award further ordered Myer to make restitution to Americo for the payments Americo made to him "during the period Myer, through M & W, owned or owns FIC stock". Myer was also ordered to pay attorney's fees, certain arbitration costs, and interest on all sums awarded.

### D. Post Arbitration Proceedings

On August 10, 2005, Myer initiated a proceeding to vacate the Award in the United States District court in Missouri. On August 11, 2005, Americo filed a petition in the state district court to confirm the Award and then moved the federal court to dismiss the federal court action or transfer it to the state district court in Texas. The federal district court dismissed the action.[4] Myer subsequently amended his pleadings in the Texas action to include a motion to vacate the award. On April 12, 2006, the Texas court entered a final judgment confirming the Award. On May 12, 2006, Myer filed a motion for new trial which was overruled by operation of law on July 26, 2006. *See* Tex.R. Civ. P. 329b. This appeal followed.

## II. STANDARD OF REVIEW

■ Initially, we must determine whether our review is governed by the Federal Arbitration Act ("FAA") or the Texas Arbitration Act ("TAA"). The FAA applies to a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2 (West 1999). The United States Supreme Court has held this statutory language is to be afforded a broad interpretation and is the functional equivalent of "affecting" interstate commerce. *See Allied–Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 273–74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The parties agree that this dispute concerning a transaction between a resident of Texas and a Missouri corporation involves interstate commerce. *See Duggan v. Zip Mail Servs., Inc.*, 920 S.W.2d 200, 202 (Mo.App.1996). But the FAA does not necessarily preempt the TAA. *See In re D. Wilson Const. Co.*, 196 S.W.3d 774, 779 (Tex.2006) (orig. proceeding). Here, however, the parties agreed to a Missouri choice of law provision. When the parties' contract provides that another state's substantive law applies, there is no legal or contractual basis to invoke the TAA. *See In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 551 (Tex.2002) (orig. proceeding); *In re Citigroup Global Markets, Inc.*, 202 S.W.3d 477, 480–81 (Tex.App.-Dallas 2006, no pet.). Therefore, we need not consider the interplay between the state and federal statutes because the TAA does not apply to this case. Our review is governed by the FAA and federal substantive law.

■ Under the FAA, we review the trial court's decision to confirm an arbitration award de novo. *Gateway Techs., Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 996 (5th Cir.1995). The Panel's award is presumed to be valid, and judicial review is

---

4. While the Texas state-court litigation was ongoing, Myer continued to challenge the Missouri court's order of dismissal in an appeal to the United States Court of Appeals for the Eighth Circuit. *See Myer v. Americo Life, Inc.*, 469 F.3d 731 (8th Cir.2006). The judgment was final in the Texas state court when the matter reached the Eighth Circuit. Consequently, the Eighth Circuit affirmed the order of dismissal on *res judicata* grounds. *Id.* at 735.

"exceedingly deferential" and "extraordinarily narrow." *See Sarofim v. Trust Co.,* 440 F.3d 213, 216 (5th Cir.2006); *Hughes Training Inc. v. Cook,* 254 F.3d 588, 593 (5th Cir.2001); *see also, First Options of Chicago v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (vacatur should only occur in "very unusual circumstances"). We are not permitted to review the arbitrator's decision on the merits even if the decision is alleged to be based on factual error or a misinterpretation of the parties' agreement. *See Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001). "When an arbitrator resolves disputes regarding the application of a contract ... the arbitrator's 'improvident, even silly, fact finding' does not provide a basis for a reviewing court to refuse to enforce the award." *Id. (citing United Paperworkers Intern. Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 39, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). The statutory bases for vacating an arbitration award are set forth in the FAA. *See* 9 U.S.C. § 10(a). Courts have also recognized certain narrow common law exceptions, but there is no uniform acceptance of all judicially-created exceptions among the circuits. *See Brabham v. A.G. Edwards & Sons, Inc.,* 376 F.3d 377, 386, n. 6 (5th Cir.2004). Two of the common law exceptions at issue here are recognized by the Fifth Circuit. Specifically, in addition to the statutory grounds, the Fifth Circuit recognizes that an award may be vacated if it results from "manifest disregard for the law", or if the award is "contrary to public policy." *See Apache Bohai Corp., LDC v. Texaco China BV,* 480 F.3d 397, 401 (5th Cir.2007); *Prestige Ford v. Ford Dealer Computer Services, Inc.,* 324 F.3d 391, 394 (5th Cir. 2003). Within this framework, we conduct our review of Myer's statutory and common law challenges to the trial court's judgment confirming the award.

## III. ANALYSIS

### A. The Arbitrators' Powers Under the Arbitration Agreement

In his first three issues, Myer asserts a statutory challenge, arguing the Award should have been vacated because the Panel exceeded its authority under the arbitration agreement. *See* 9 U.S.C. § 10(a)(4). We disagree.

 The parties agree the dispute was arbitrable. An arbitrator's jurisdiction is defined by the contract containing the arbitration clause and by the issues actually submitted to arbitration. *See Executone Information Systems, Inc. v. Davis,* 26 F.3d 1314, 1323 (5th Cir.1994). In deciding whether the arbitrator exceeded his jurisdiction, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *See Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

 Myer asserts the notice provision in Section 11.3 of the purchase agreement applies to disputes under the consulting agreement. This paragraph provided:

> If a party has a claim against [a] party ... the party shall give written notice of such claim ... specifying the nature, estimated amount and the specific basis for such claim. The ... party shall respond ... within 30 days of receipt of such notice....

The paragraph further provided that upon receipt of the notice the parties were required to negotiate in good faith to resolve the dispute. If there was no resolution, the parties were free to pursue any available remedies.

There is no dispute that Americo did not give notice to Myer. Americo argues notice was not required because its claims

were based on the consulting agreement, not the purchase agreement. In support of its argument, Americo points out that the consulting agreement does not expressly incorporate by reference all of Section 11 of the purchase agreement. The only provision of the purchase agreement expressly incorporated by reference in the consulting agreement is Section 11.5. Consequently, Americo contends the notice provision in Section 11.3 of the purchase agreement does not apply to the consulting agreement. On the other hand, Myer argues notice was a condition precedent to arbitration, and absent the requisite notice and negotiation, the Panel had no power to arbitrate the dispute. Myer's argument is predicated on the interpretation of the consulting agreement to incorporate all of section 11 of the purchase agreement.

■■■ The Panel rejected Myer's argument [5]. On appeal, Myer urges that we are free to scrutinize the Award to determine if the Panel exceeded its authority. Nonetheless, we must also be mindful of the fact that the interpretation of the contract was a matter for the Panel to decide. We are not free to vacate the Award on the ground that the Panel misread the contract. *See Misco,* 484 U.S. at 38, 108 S.Ct. 364. Moreover, procedural questions such as whether any contractually-based prerequisites to arbitration have been satisfied, when intertwined with the underlying facts of the dispute, are left to the Panel. *See American Realty Trust, Inc. v. JDN Real Estate–McKinney, L.P.,* 74 S.W.3d 527, 531 (Tex.App.-Dallas 2002, pet. denied) *(citing Del E. Webb Constr. v. Richardson Hosp. Auth.,* 823 F.2d 145, 149 (5th Cir.1987)). Whether the notice provisions in the purchase agreement were applicable to the consulting agreement is a matter of contract interpretation. Wheth-

er compliance with the notice requirement is a prerequisite to arbitration is a procedural matter within the exclusive province of the Panel. Thus, the trial court properly refused to disturb the Panel's determination that the prerequisites to arbitration had been met. Myer's first issue is overruled.

■■■ In his second and third issues, Myer contends the Panel exceeded its powers when it rendered the Award without finding that:(1) Americo "incurred or suffered" damages as required by section 11.1 of the purchase agreement; and (2) Americo suffered a threshold amount of $250,000 in damages as required by Section 11.4 of the purchase agreement. The crux of Myer's argument is that the Panel had no authority to award restitution because the parties' agreement required a determination that Americo suffered in excess of $250,00 in damages before any relief could be awarded. Myer relies on the indemnity provisions in the purchase agreement to advance this argument. Section 11.1 of the purchase agreement states:

*Indemnification by Myer and the Marketing Companies.*

Myer and the Marketing Companies shall have no liability or obligation for Damages **under this agreement** except as set forth in this Article ... Myer and the Marketing Companies shall jointly and severally indemnify, defend and hold harmless [Americo and others] against and in respect of all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies ... (collectively, "Damages"), that any of such parties shall incur or suffer which arise or result from, or relate to....

---

**5.** The argument was also rejected by the two state district courts; first, when urged as a

basis for Myer's motion to stay the arbitration, and later as a basis to vacate the award.

(Emphasis added). The enumerated categories from which damages may "arise or result from, or relate to" include breach of the representations and warranties of the purchase agreement, third party claims concerning business operations prior to closing and pertaining to certain specified contracts, marketing activities prior to closing, and the administration of business. Section 11.4 of the purchase agreement provides claims limitation for the indemnifying parties. This section states:

> An Indemnifying Party shall not have any liability or obligation for any damages **under this agreement** unless the aggregate amount of all Damages charged to such party exceeds $250,000, in which case such Indemnifying Party shall be liable only for the amount of such Damages over $250,000.

(Emphasis added). The purchase agreement defines Indemnifying Party as a person against whom a claim for indemnification under section 11.1 or 11.2 has been asserted. Damages are as defined in section 11.1.

Myer's argument is premised on the incorporation of these indemnity provisions from the purchase agreement into the consulting agreement. But Myer's interpretation is strained, and ignores the unambiguous language of both contracts. Sections 11.1 and 11.4 of the purchase agreement provide for indemnity **under the purchase agreement.** The definition of damages upon which Myer relies appears in the context of defining Myer's obligation to indemnify Americo against certain liabilities in connection with the purchase. The $250,00 damages threshold applies to an indemnifying party—a party against whom a claim for indemnity has been made. The claim before the Panel involved alleged breaches of the consulting agreement, not a claim for indemnity under the purchase agreement. More-

over, the consulting agreement expressly incorporated only one section of the purchase agreement, and this express incorporation did not include sections 11.1 and 11.4. Although the Panel did not make any express findings concerning Myer's urged interpretation of the purchase agreement, the Award reflects the Panel's implicit conclusion that Sections 11.1 and 11.4 of the purchase agreement did not apply to disputes under the consulting agreement. The trial court properly declined to disturb the Panel's interpretation of the contract.

In addition, the consulting agreement gave the Panel broad authority to fashion an award for equitable relief. The consulting agreement stated:

> The parties recognize that irreparable damage will result ... from any violation of this Agreement ... and that the extent of such damage would be difficult if not impossible to calculate. Accordingly, the parties expressly agree that, in addition to all other remedies ... such parties shall have the remedies of restraining order and injunction, and any such other equitable relief as may be declared ... to enforce the provisions of sections 7 through 9 . . . .

Therefore, there is no question the panel had the authority to award restitution and injunctive relief. We cannot conclude the trial court erred when it refused to find that the Panel exceeded its authority by rendering an award contrary to the express agreement of the parties. Myer's second and third issues are overruled.

### B. Manifest Disregard

Myer's fourth, fifth, and sixth issues are based on a non-statutory ground for vacatur, manifest disregard for the law. The Fifth Circuit recognized "manifest disregard" in *Williams v. Cigna Fin. Advisors, Inc.,* 197 F.3d 752, 759 (5th Cir.1999),

stating "parties [are] bound by [an] arbitrator's decision not in 'manifest disregard' of the law." *Id.* (*citing First Options, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). Manifest disregard for the law is more than mere error or misunderstanding with respect to the law. *Prestige Ford,* 324 F.3d at 395 (*quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986)). There are two parts to a manifest disregard analysis. First, "the error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *See Kergosien,* 390 F.3d at 355. The term "disregard" implies that the arbitrator "appreciate[d] the existence of a clearly governing principle but decided to ignore or pay no attention to it." *Id.* In addition, "the governing law must be well defined, explicit, and clearly applicable." *Id.* (*quoting Merrill Lynch,* 808 F.2d at 934). But even if it is manifest that the arbitrators acted contrary to the applicable law, the second part of the analysis requires the court to find that the award resulted in a significant injustice. *See Apache,* 480 F.3d at 405; *Sarofim,* 440 F.3d at 217.

■ Myer argues the remedy of rescission fails to correlate with any damages and there must be a finding of damages before relief can be awarded. We have already addressed Myer's contention concerning the incorporation of the indemnity provisions of the purchase agreement into the consulting agreement. We note, however, that the Panel was empowered under the terms of the consulting agreement to award equitable relief, and conclude that the absence of a damages finding was not in manifest disregard of the law.

Myer also characterizes the Award as ordering "partial rescission" and argues the Award manifestly disregards the law

because Missouri law does not allow partial rescission. To underscore his argument, Myer points out that the Panel expressed some concern about the remedy when it denied his motion for summary judgment. But there was extensive briefing on the issue, and the Panel ultimately determined, both at the summary judgment phase and when making the Award, that Myer's argument was not meritorious. Nothing in the record suggests the Panel afforded the issue anything other than careful and deliberate consideration. We regard the Panel's expression of concern as indicative of the prudence with which the Panel fashioned the Award.

The Award states that "Americo shall be entitled to restitution of any payment it made to Myer during the period Myer directly, through M & W, owned or owns the FIC stock." Both parties devote considerable effort toward the distinctions between rescission and restitution in Missouri. In Missouri, courts have held that a party to a contract may rescind a contract if there is a material breach. *See Bishop v. Nu–Way Service Stations, Inc.,* 313 F.Supp.2d 1026, 1031 (E.D.Mo.2004) (applying Missouri law). Rescission involves the cancellation of a contract. *See Curt Ogden Equip. Co. v. Murphy Leasing Co.,* 895 S.W.2d 604, 609 (Mo.App.1995). On the other hand, restitution involves returning a party to the same position he occupied before the contract was made. *See Harris v. Desisto,* 932 S.W.2d 435, 438 (Mo.App.1996). Restitution generally accompanies an award of rescission. *Id.* But the award of restitution does not always follow a claim for rescission. When a party sues for breach of contract, restitution is one of the remedies he may elect. *See Kim v. Conway & Forty, Inc.,* 772 S.W.2d 723, 726 (Mo.App.1989).

Significantly, as evidenced by its use of the term "restitution" rather than rescis-

sion, the Panel viewed the Award as ordering restitution. We are not free to recharacterize the Award based upon its alleged effect. The Panel did not cancel the contract, in whole or in part; Myer was simply ordered to repay the benefits he received during the time he failed to perform his promise not to compete. We will not second-guess multiple, implicit findings and conclusions underpinning the Award. We are not convinced the governing law has such pristine clarity and irrefutable applicability as to render the Award an extraordinary departure from established principles of jurisprudence. We see no such departure here.

Myer also maintains the primary purpose of the consulting agreement was to provide consulting services, and the non-solicitation and noncompete provisions were just ancillary to the primary agreement. As a result, Myer insists there can be no material breach, and therefore rescission is not available.

The determination of whether there was a material breach of the consulting agreement, as well as the selection and determination of available remedies was the sole purview of the Panel. When considering whether the Award should be vacated, the trial court was not empowered to re-visit these issues. *See Misco,* 484 U.S. at 38, 108 S.Ct. 364 (when determining vacatur, courts do not sit to hear claims of legal or factual error). Likewise, our limited scope of review does not extend to factual determinations concerning materiality, or whether the law has been correctly applied. On this record, it is not manifest that the Panel misapplied the law. And even if it were manifest, Myer has not established that the Award resulted in significant injustice. Myer received substantial payments in exchange for his promise to not engage in anticompetitive activities. The Panel found Myer breached

his promise. We see no injustice in the refusal to allow a party to reap the benefits of a bargain for which his own promised performance has failed. Myer's fourth, fifth, and sixth issues are overruled.

*C. Fundamental Rationality*

In his seventh, eighth, ninth, and tenth issues, Myer contends the trial court erred in refusing vacatur because the Award failed to meet the "fundamental rationality" test. Myer asserts the Award is completely irrational because the parties' agreement required that actual damages be suffered or incurred before relief could be awarded. According to Myer, the award of restitution is actually an award of partial rescission and therefore the Award does not draw its essence from the parties' agreement. Myer further asserts the arbitrators failed to draw from the essence of the parties' agreement because requiring him to give up his compensation created a forfeiture. Finally, Myer argues the Award cannot stand the test of fundamental rationality because M & W is required to divest itself of the FIC stock, and such a divestiture would violate federal securities laws because the stock is unregistered and may not permissibly be sold.

The fundamental rationality test is not uniformly recognized as a valid judicially-created ground for vacatur, and the nature of such a test is less than clear. It is not one of the two non-statutory grounds for vacatur recognized by the Fifth Circuit. *See Kergosien v. Ocean Energy, Inc.,* 390 F.3d 346, 353 (5th Cir.2004). But the Third, Eighth, and Ninth Circuits have recognized that an award may be vacated as completely irrational. *See e.g., Schoch v. InfoUSA, Inc.,* 341 F.3d 785, 788 (8th Cir. 2003); *Swift Indus., Inc. v. Botany Indus., Inc.,* 466 F.2d 1125, 1131 (3rd Cir.1972); *G.C. & K.B. Invs. v. Wilson,* 326 F.3d

1096, 1105 (9th Cir.2003). Myer argues we should follow the test as articulated by the Third Circuit in the *Swift* case. The *Swift* court stated, in pertinent part:

> An arbitrator's award does not draw its essence from the agreement if the arbitrator's interpretation cannot be rationally derived therefrom ... [A]n award may not stand if it does not meet the test of fundamental rationality.

*Id.* Based on Myer's formulation of the issues and the Third Circuit's articulation of the test, it appears the measure for rationality is whether the award draws its essence from the parties' agreement. We therefore construe Myer's argument not as urging an independent test for vacatur, but rather as a restatement of the "essence test."

The essence test is an application of the inquiry into whether arbitrators have "exceeded their powers", but it is not a separate non-statutory ground for vacatur. *See Kergosien,* 390 F.3d at 353–54. Instead, the essence test is "part and parcel" of a statutory inquiry under the FAA into whether the arbitrator exceeded his powers. *See Brabham,* 376 F.3d at 384. Under the essence test, the "single question is whether the award, however arrived at, is rationally inferable from the contract." *Apache,* 480 F.3d at 397 (*quoting Executone,* 26 F.3d at 1325). Thus, the inquiry comes full circle, and we examine Myer's contentions to determine whether the Panel exceeded its authority by entering an award that was not rationally inferable from the contract. As discussed previously, the Award was not an irrational exercise of powers beyond the Panel's authority. Myer's seventh, eighth, and ninth issues are overruled.

We similarly reject the argument concerning the Award's divestiture requirement. Myer contends the divestiture is irrational because it requires M & W to do an impossible act. But Myer presents no authority for the proposition that the stock is not registered and may not be sold. The Award is entitled to all presumptions of validity. *See Misco,* 484 U.S. at 38, 108 S.Ct. 364. In addition, when ordering Myer to exercise his best efforts to cause M & W to divest itself of the FIC stock, the Panel recognized this requirement could be accomplished in several ways: (1) Myer could relinquish his or his Trust's interest in M & W; (2) Myer could dissolve M & W, receive his portion of the stock, and sell it; or (3) Myer could divest himself of the FIC stock. The Panel further acknowledged "[t]here may be other ways for Myer to divest himself of the FIC stock." The consulting agreement affords the Panel wide latitude to award both legal and equitable relief. The Panel found that Myer violated the non-compete provisions of the contract by purchasing the FIC stock. This Award draws its essence from the parties' agreement. Because the Award is rationally inferable from the contract, the trial court did not err by refusing vacatur. Myer's tenth issue is overruled.

## D. Public Policy

In issues eleven, twelve, and thirteen, Myer insists the Award contravenes Missouri public policy. A court may refuse to enforce an arbitration award that is contrary to public policy. *Prestige Ford,* 324 F.3d at 396. Public policy used to vacate an award must be "explicit, well defined, and dominant." *Sarofim,* 440 F.3d at 219. The policy advanced must reference "laws and precedents" rather than "general considerations of proposed public interests." *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).

Myer first agues the Award contravenes deeply-rooted Missouri public

policy because Missouri law does not recognize partial rescission. We have already addressed Myer's argument concerning partial rescission. For the same reasons, we conclude the trial court correctly determined that the Award did not violate public policy.

Myer also argues the Award orders a forfeiture and requires him to work without compensation, both of which violate public policy. But the Award does not require Myer to return earned compensation. Instead, he is required to return payments he received during the period he was in breach of the agreement. Americo contends services were neither requested nor provided. Myer has not identified any evidence presented to the Panel to establish that Americo actually called upon him to provide consulting services, or that any such services were provided in exchange for the payments he received. Future payments are suspended only until Myer complies with the mandatory injunction by divesting himself of the FIC stock. Thus, there is nothing to substantiate Myer's characterizations of the Award. Given the evidence before the Panel, Myer fails to demonstrate the Award violated an explicit public policy. As a result, the trial court correctly refused to vacate the Award on this ground.

*E. Attorney's Fees*

■ Myer asserts the award of attorney's fees was improper because the Award should have been vacated. The Panel entered an Award in favor of Americo. Section 15 of the consulting agreement provides that a prevailing party to a dispute shall be entitled to costs and attorney's fees. Therefore, Americo was entitled to attorney's fees. Because we have concluded the trial court did not err when it confirmed the Award, the award of at-

torney's fees was not improper. We resolve Myer's fourteenth issue against him.

## IV. CONCLUSION

Because we conclude there was no statutory or common law basis to vacate the Award, the trial court's confirmation of the Award was not error. We affirm the judgment of the trial court.