

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-08-00073-CV
_____


XTRIA L.L.C., Appellant

V.

INTERNATIONAL INSURANCE ALLIANCE INCORPORATED, Appellee


On Appeal from the 14th Judicial District Court
Dallas County, Texas
Trial Court No. 08-00954-A


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Xtria, L.L.C. (Xtria) appeals the trial court's refusal to vacate a commercial arbitration award made in favor of International Insurance Alliance Incorporated (International) in the amount of $1,350,000.[1] In its appellate brief, Xtria claims that the arbitrator made a gross mistake and/or manifestly disregarded the law because International's claims were barred due to a previous settlement entered into between Xtria and International's subsidiary.

## I.    FACTUAL AND PROCEDURAL HISTORY

### A.    2000 Xtria–Tracking Systems Contract

A software product was designed by e.Liens, Inc., for insurance companies that electronically notified mortgagees and lienholders if a borrower failed to comply with insurance requirements specified in their loan agreements. Tracking Systems, Inc., acquired this software through the purchase of all e.Liens, Inc., stock. In 2000, Tracking Systems sold this software to Xtria's predecessor pursuant to an Asset Purchase Agreement. This agreement contained a provision that allowed Tracking Systems a right to twenty percent of the increase in value of the e.Liens software if Xtria ever sold it to another party ("earn-out provision").

---

[1] This case was transferred to this Court from the Fifth District Court of Appeals in Dallas as part of the Texas Supreme Court's docket equalization program. Except as noted and considered below, we are not aware of any conflict between the precedent of the Dallas Court and the precedent of this Court on any issue relevant in this appeal. *See* TEX. R. APP. P . 41.3.

**B.      2004 Xtria–International Contract**

In 2004, Xtria and Tracking Systems's parent company, International,[2] entered into a Sales Representative Agreement (International Sales Agreement) whereby International agreed to act as Xtria's "agent . . . with respect to all software, information systems, products and services, together with all updates, revisions and improvements," and as "non-exclusive agent for the sale of Products in North America."  International was also to "assist [Xtria] by soliciting and marketing . . . the Products within the Product Territory."[3]  In exchange, International would receive fifteen percent "commission, in perpetuity, for the sale of [Xtria's] Products."  Further, the contract allowed International to have exclusive marketing rights within twelve months of termination.  These provisions were designed to protect International from the possibility that it would expend its time and effort to develop the marketing of the product only to have Xtria then abruptly sell the product to a third party who would benefit from International's efforts, thereby depriving International of the fruits of its labors expended in obtaining prospective buyers.[4]

**C.      Xtria Sells e.Liens Business**

Xtria sold the software to ISO Claims Service, Inc. in 2005, triggering obligations under both the agreement with Tracking Systems and the agreement with International.

---

[2]International is a holding company.

[3]Nothing in this contract limits International's responsibilities to the e.Liens software product.

[4]Prior to the International Sales Agreement, e.Liens was worth $300,000–$400,000.  It sold for $5.4 million.

Since there were several insurance companies negotiating to sign on to use the e.Liens product, and ISO would benefit from these new customers, International believed that ISO would assume the contract, even after the 2005 sale had been completed. A schedule to the ISO Purchase Agreement clarified that Xtria was retaining the International Sales Agreement. However, ISO, which had its own sales force, did not assume the International Sales Agreement. Upon learning of the sale, Tracking Systems demanded that Xtria pay it what it said that it believed it had coming to it under the earn-out provision, but the parties disagreed as to the amount of money Xtria owed Tracking Systems. It resulted in a July 2006 mediated Settlement Agreement and Release (Tracking Systems–Xtria Settlement) that awarded Tracking Systems $555,000. Tracking Systems's release disposed of all "past, present and future claims," whether known or unknown, "relating to or arising from (i) the [Tracking Systems]–Xtria Agreement,[5] and/or (ii) any oral or other written agreement between [Tracking Systems] and Xtria." The definition of Tracking Systems and Xtria included "past, present and future affiliates." While the release executed by Xtria included "Xtria and the future assigns of all Persons within the definition of Xtria . . . ," Tracking Systems's release did not include such language. Nevertheless, Xtria argues that this release covers independent claims made by International arising from the facts set out below.

In December 2006, asserting that it could have received commissions in connection with sales of the e.Liens product, International alleged that Xtria breached the International Sales

---

[5]The Tracking Systems–Xtria Agreement was defined as the Asset Purchase Agreement entered into by Tracking Systems dated June 1, 2000.

Agreement to market the software. International invoked the contract's arbitration clause, filed an arbitration demand with the American Arbitration Association, and a California arbitrator was chosen to mediate the case.

In February 2007, Xtria brought suit aginst Tracking Systems (not International) in the United States District Court for the Northern District of Texas seeking a declaration that the Tracking Systems–Xtria Settlement discharged and extinguished Xtria's liability to International since it resolved claims that could be asserted by "past, present and future affiliates" of Tracking Systems. At the same time, Xtria moved the California arbitrator to stay its arbitration with International until the federal case against Tracking Systems was resolved.

## D.       Procedural History of the Arbitration

The arbitrator denied the motion to stay but told Xtria it could present evidence on the affiliate issue at the evidentiary hearing. The arbitrator reasoned:

> [O]wnership or management, if such be the case, does not make one entity an affiliate of another. In California, a corporation is an affiliate of another corporation "if it is directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the other specified corporation." Corp. Code § 150. The essence of an affiliate is control. Here there is a lack of proof of such control.[6]

---

[6]Xtria acknowledged the California Code definition of "affiliate" is the same in Texas. TEX. BUS. ORGS. CODE ANN. § 1.002(1) (Vernon 2008).

### 1.    The Affiliate Issue

The arbitration hearing on International's claims and the "affiliate defense" raised by Xtria commenced December 10, 2007, and continued for four days.  In it, Xtria argued that International and Tracking Systems had common control.  Barry Maashoff was president of Tracking Systems and served as International's secretary, treasurer, and chairman of its board of directors.  Mike Cooney was president of International and there is some evidence that Cooney was also involved with Tracking Systems at a managerial level.  A business plan developed during Tracking Systems's acquisition of e.Liens listed Cooney as the CEO/manager "managing this business day to day" and outlined his respective responsibilities.[7]  Maashoff's and Cooney's positions allowed them to sign off on documents for both International and Tracking Systems interchangeably.  For example, Cooney signed the e.Liens acquisition documents for Tracking Systems as an officer authorized by Maashoff "for this one project" while Maashoff signed off on International documents instead of Cooney.  Based on Maashoff's and Cooney's close connection to both companies, Xtria argued that Tracking Systems and International were commonly controlled.

Next, Xtria tried to establish International's affiliation with Tracking Systems through evidence of stock ownership by Maashoff and Cooney.  Xtria demonstrated that Maashoff owned

---

[7]From 1999–2000, Cooney was involved in the e.Liens business with Tracking Systems and may have managed it for a period of six months.  Cooney claimed this business plan was not put into place and that he probably put the plan together to help Maashoff.  Some Tracking Systems documents also list Cooney as secretary, although he claims "this was . . . purely an administrative function" and does not remember being on the board of Tracking Systems.

forty-one percent and Cooney owned ten percent of the Tracking Systems stock—enough to collectively give them majority shareholder status. Then, Xtria demonstrated that because Maashoff owned sixty percent of International through his family company JenJeffJo (JJJ), and Cooney owned the other forty percent, they were also majority shareholders of International. Xtria claims the majority ownership of both companies amounted to control, evidencing International's affiliation with Tracking Systems. Finally, Xtria also pointed out that International, Tracking Systems, Cooney, and Maashoff officed in the same building.

International countered by claiming that there was no evidence that Tracking Systems and International were related, worked toward the same goal, or that there was mutual control. Tracking Systems stated "[International] is not an affiliate of [Tracking Systems] . . . [they] have separate corporate structures, different shareholders, and different members on the board of directors. . . . [Tracking Systems] has no control or authority over [International] and cannot dictate its actions." Cooney testified that he owned International and called the shots, characterizing Maashoff as just an investor.

### 2. The Intent of the Parties

There was also testimony about the parties' intent when Tracking Systems and Xtria entered into the settlement agreement. Howard Wadsworth, an officer of Xtria, stated he would not have recommended that Xtria agree to pay $555,000 under the Tracking Systems–Xtria Settlement unless

7

he believed that the settlement successfully exculpated Xtria from any liability for subsequent claims by International.

Wadsworth's testimony was countered by the testimony of Kenneth Owensby, a former vice president of Xtria, who was responsible on behalf of Xtria for the sale of e.Liens and who had negotiated and signed the International Sales Agreement on its behalf. Owensby testified that the agreement was a back-end-weighted deal (meaning that International would not get the typical front-end commission, but would collect revenues as transactions processed and throughout the term of the insurance company's agreement). He further explained that this kind of arrangement motivated companies like International to not only make the initial sale of the software, but to continue to service the business in order to keep the insurance company clients who purchased it satisfied. Because of this type of arrangement, Owensby stated that when e.Liens was sold, either ISO could assume the obligation under the International contract or, if not, Xtria would either be forced to buy International out of its deferred payment or somehow otherwise compensate them.[8]

Moreover, because there was evidence in the record that Xtria paid Newport, a third-party broker similar to International, for similar claims in another settlement, International argued that

---

[8]Owensby explained why Xtria should have bought out International. The e.Liens package was attached to the International Sales Agreement calling for fifteen percent commission to International. Since ISO already had a sales force, the package was automatically worth fifteen percent more to them than it should have been, thereby elevating the built-in revenue stream. Xtria knew and benefitted from this because the value of the e.Liens package they were selling also increased by fifteen percent. Cooney presents the theory that under the International Sales Agreement, International exclusively owned the marketing rights which Xtria did not have the right to sell to ISO without justly compensating International.

Xtria should have anticipated that International's claims would be filed. Despite this prior experience, International argued that Xtria did not expressly include International's claim in the Tracking Systems–Xtria Settlement because Xtria never contemplated that the Tracking Systems release would apply to International.

### 3. The Arbitrator's Award

At the conclusion of the lengthy hearing and after reviewing post-hearing briefs, the arbitrator found that Xtria had breached the International Sales Agreement and awarded International $1,350,000 on January 18, 2008. In determining that all obligations were still owed to International irrespective of Xtria's sale of the business to ISO, the arbitrator reasoned that "modification of the [International Sales Agreement] requires the written agreement of both parties." Since no modification was made, Xtria owed International all commissions as specified in the International Sales Agreement. The arbitrator also found that Tracking Systems and International were not affiliates and that neither Tracking Systems nor Xtria intended for the Tracking Systems–Xtria Settlement to bar International from seeking relief on separate claims.

### E. State Court Proceeding in Dallas

While International filed a motion for confirmation of the award, Xtria filed a motion asking the trial court to vacate the arbitration award due to the arbitrator's "Evident Partiality," "Gross Mistake," and "Manifest Disregard for the Law" when ruling on the affiliate issue.[9] The trial court

---

[9]The evident partiality issue was abandoned on appeal.

9

granted International's motion to confirm the arbitration award on March 12, 2008. In its findings of fact and conclusions of law supporting the confirmation, the trial court noted that "Xtria does not claim that the Arbitrator used an incorrect definition for 'affiliate,' but rather that he misapplied the law to the facts and 'ignored a mountain of conclusive evidence and stipulations to the contrary.'"

## II.    GENERAL STANDARD OF REVIEW

An arbitration award is conclusive "on the parties as to all matters of fact and law because the award has the effect of a judgment of a court of last resort." *Powell v. Gulf Coast Carriers, Inc.*, 872 S.W.2d 22, 24 (Tex. App.—Houston [14th Dist.] 1994, no writ). This Court's review of an arbitrator's findings is "extraordinarily narrow." *Werline v. E. Tex. Salt Water Disposal Co.*, 209 S.W.3d 888, 897 (Tex. App.—Texarkana 2006, pet. granted). Because arbitration is a favored means of dispute resolution, every reasonable presumption is indulged in favor of upholding the arbitration award. *Id.*; *JJ-CC, Ltd. v. Transwestern Pipeline Co.*, No. 14-96-1103-CV, 1998 WL 788804, at *4 (Tex. App.—Houston [14th Dist.] Nov. 12, 1998, no pet.) (not designated for publication).

Review is so limited that a mistake of fact or law or failure to correctly apply the law will not justify vacating an arbitrator's award. *Werline*, 209 S.W.3d at 897; *Crossmark, Inc. v. Hazar*, 124 S.W.3d 422, 434–35 (Tex. App.—Dallas 2004, pet. denied). We are not limited to the arbitrator's explanation for his award. *JJ-CC, Ltd.*, 1998 WL 788804, at *4. Rather, we look to the result

10

achieved and determine whether the arbitration award is "rationally inferable." *Id.*; *see also Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994).

Additionally, we review de novo a trial court's confirmation of an arbitration award while giving strong deference to the arbitrator with respect to issues properly left to the arbitrator's resolution. *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 339–40 (5th Cir. 2004); *Am. Realty Trust, Inc. v. JDN Real Estate-McKinney, L.P.*, 74 S.W.3d 527, 531 (Tex. App.—Dallas 2002, pet. denied).

## III.    VACATUR STANDARDS

Both parties agree that this is a dispute arising from a matter involving interstate commerce. As conceded, the Federal Arbitration Act (FAA) applies. *In re L.L. Kempwood Assocs., L.P.*, 9 S.W.3d 125, 127 (Tex. 1999). Under the FAA, an arbitration award may be vacated if:

(1) it was procured by corruption, fraud, or undue means;

(2) there was evident partiality or corruption on the part of the arbitrators;

(3) the arbitrators were guilty of misconduct in refusing to postpone a hearing or hear evidence pertinent to the controversy which resulted in prejudice to a party; and

(4) the arbitrators exceeded their powers or no definite award was made.

9 U.S.C. § 10 (West, Westlaw through April 24, 2009).

No statutory grounds of vacatur were raised in this appeal. Instead, we address Xtria's question whether state and federal common-law vacatur standards apply *in addition to* the FAA's statutory standards.

11

After the FAA was enacted, some federal courts added common-law grounds for vacatur, including an arbitrator's manifest disregard of the law. *Action Box Co. v. Panel Prints, Inc.*, 130 S.W.3d 249, 252 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (referring to *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 231 (1987)) (manifest disregard standard is "a federal common law doctrine, the underlying rationale for which the United States Supreme Court has largely rejected as reflecting a general suspicion of the desirability of arbitration and competence of arbitration tribunals"). State courts followed suit. The San Antonio, Dallas, Fort Worth, Amarillo, and Tyler Courts of Appeals adopted the use of this federal common-law "exception[] recognized by the Fifth Circuit" for cases decided under the FAA. *Galvan v. Centex Home Equity Co.*, No. 04-06-00820-CV, 2008 WL 441773, at *3 (Tex. App.—San Antonio Feb. 20, 2008, no pet.) (mem. op.); *Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 814 (Tex. App.—Dallas 2008, pet. denied); *Banc of Am. Invs. Servs., Inc. v. Lancaster*, No. 2-06-314-CV, 2007 WL 2460277, at *7 (Tex. App.—Fort Worth, Aug. 31, 2007, no pet.) (mem. op.); *P. McGregor Enters., Inc. v. Denman Bldg. Prods., Ltd.*, No. 07-05-0385-CV, 2007 WL 1201545, at *5 (Tex. App.—Amarillo Apr. 24, 2007, pet. denied); *John M. O'Quinn, P.C. v. Wood*, Nos. 12-06-00151-CV, 12-06-00188-CV, 2006 WL 3735617, at *2 (Tex. App.—Tyler Dec. 20, 2006, no pet.) (mem. op.).

State courts also developed other common-law vacatur standards such as fraud, misconduct, and "such gross mistake as would imply bad faith" and/or "failure to exercise honest judgment." *Werline*, 209 S.W.3d at 897–98. Traditionally, unless an issue of pre-emption was involved, both

12

Federal and State laws were implicated where an arbitration agreement failed to specify which was to be employed.[10] *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 779 (Tex. 2006); *Action Box Co.*, 130 S.W.3d at 252 n.5 ("[T]he federal act preempts all otherwise applicable state laws . . . the state law standard under the CPRC and the federal common law standard could not apply in the same case . . . .").

However, a recent United States Supreme Court case has called into question the application of common-law vacatur grounds where the FAA applies. The Supreme Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, rejected the theory that parties could contract to modify FAA standards for vacatur and held that "§§10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification."[11] ___ U.S. ____, 128 S.Ct. 1396, 1402 (2008). Although not specifically in issue, *Hall* discussed the manifest disregard standard as first presented by *Wilko v. Swan*, 346 U.S. 427 (1953), *overruled by Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). *Hall*, 128 S.Ct. at 1403. The Supreme Court decision discussed the split among federal circuits on the issue of whether manifest disregard was a new ground that could be used to

---

[10]While the International Sales Agreement contained a Texas choice of law clause, the United States Fifth Circuit and the Texas Supreme Court have held "an arbitration clause and a generic choice-of-law clause . . . [do not] demonstrate a clear intent to displace the FAA's vacatur standards and replace them with ones borrowed from [state] law." *Action Indus., Inc.*, 358 F.3d at 340, 342.

[11]Similarly, the Texas General Arbitration Act cannot expand grounds for review beyond those enumerated in contract. *Quinn v. Nafta Trades, Inc.*, 257 S.W.3d 795, 799 (Tex. App.—Dallas 2008, pet. filed).

overturn an arbitrator's decision under *Wilko* and decided (albeit in dictum) that it was not. *Hall*, 128 S.Ct. at 1404.

*Hall* noted:

[i]n holding that §§ 10 and 11 provide exclusive regimes for the review provided by the statute, we do not purport to say that they exclude more searching review based on authority outside the statute as well. The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable. But here we speak only to the scope of the expeditious judicial review under §§ 9, 10, and 11, deciding nothing about other possible avenues for judicial enforcement of arbitration awards.

*Id.*

Also, *Hall* did not expressly overrule or even clarify the rulings in some Texas courts that common-law grounds, including gross mistake, are cumulative of statutory grounds for vacatur. *Werline*, 209 S.W.3d at 898; *Pheng Invs., Inc. v. Rodriquez*, 196 S.W.3d 322, 328–29 (Tex. App.—Fort Worth 2006, no pet.); *Int'l Bank of Commerce-Brownsville v. Int'l Energy Dev.*, 981 S.W.2d 38, 47–48 (Tex. App.—Corpus Christi 1998, pet. denied). *But see Quinn*, 257 S.W.3d at 799 n.3 (expressing no opinion on whether common-law grounds are available with respect to arbitration covered by the Texas General Arbitration Act and recognizing that the issue of "whether common law grounds are preempted by the TAA . . . has yet to be decided by the Texas Supreme Court").

The language in *Hall* caused much confusion in federal circuits and resulted in further split decisions regarding the applicability of manifest disregard as a federal nonstatutory "common law"

14

ground for vacatur, separate and apart from FAA arbitration.  *See Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, No. 06-3474-CV, 2008 WL 4779582, at *6–8 (2d Cir. Nov. 4, 2008) (general discussion regarding split among circuits).  In March of this year, the Fifth Circuit resolved this question due to differing opinions in federal district courts in Texas.  *Millmaker v. Bruso*, No. H-07-3837, 2008 WL 4560624, at *6 n.8 (S.D. Tex. Oct. 9, 2008); *Wood v. Penntex Res. LP*, No. H-06-2198, 2008 WL 2609319, at *8 n.4 (S.D. Tex. June 27, 2008) ("*Hall Street* overrules Fifth Circuit precedent establishing manifest disregard of clearly applicable law as an additional ground for vacatur distinct from the explicitly enumerated statutory grounds");[12] *Householder Group v. Caughran*, 576 F.Supp.2d 796, 800 (E.D. Tex. 2008) (failing to apply manifest disregard standard after recognizing *Hall* called it into doubt).

The Fifth Circuit held that manifest disregard vacatur ground is no longer a "federal common law" standard, and state law to the contrary is pre-empted.  *Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009).  As noted previously, this case was transferred to this Court from the Dallas Court of Appeals and we are obligated to "decide the case in accordance with the precedent of the transferor court under principles of stare decisis." TEX. R. APP. P. 41.3.  The Dallas Court of Appeals has based its application of the manifest disregard standard on Fifth Circuit precedent.  *See Roehrs*, 246 S.W.3d at 814; *Myer v. Americo Life, Inc.*, 232 S.W.3d 401, 410–11

---

[12]The Southern District developed this view after abandoning previous post-*Hall* applications of manifest disregard. *Halliburton Energy Servs., Inc. v. NL Indus.*, 553 F.Supp.2d 733, 753 (S.D. Tex. 2008) (applying manifest disregard standard "out of an abundance of caution").

(Tex. App.—Dallas 2007, no pet.). Following that precedent, we could conceivably apply the Fifth Circuit's rulings here.

However, Texas courts of appeals are not necessarily bound under stare decisis to follow rulings of the Fifth Circuit—even on federal issues—and the *Hall Street* opinion has provided mixed results. *Dewey v. Wegner*, 138 S.W.3d 591, 601 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (per curiam)). Therefore, rather than attempt to auger the minds of the Dallas Court of Appeals on this matter, we will decide this case based on current Dallas court precedent, which recognizes both manifest disregard of the law as well as gross mistake as grounds for vacatur of an arbitrator's decision.

Thus, without making a determination that the so-called common-law grounds for vacatur no longer exist and, since the outcome of this dispute remains the same under either analysis, in the attitude of cautiously donning both a belt and suspenders, we address the merits of Xtria's complaint that the arbitrator manifestly disregarded the law and committed a gross mistake when effectively "rewriting" an unambiguous settlement agreement and interpreting that the parties intended to exclude International as an affiliate of Tracking Systems.

## IV. APPLICATION

### A. Manifest Disregard

Manifest disregard is a very narrow standard of review. *Home Owners Mgmt. Enters., Inc. v. Dean*, 230 S.W.3d 766, 768–69 (Tex. App.—Dallas 2007, no pet.). It is more than error or

misunderstanding of the law. *Galvan*, 2008 WL 441773, at *3; *Home Owners Mgmt.*, 230 S.W.3d at 768. The error must be "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Galvan*, 2008 WL 441773, at *3. Under this standard, the arbitrator recognizes a clearly governing principle and ignores it. *Id.* In other words, the issue is not whether the arbitrator correctly interpreted the law, but whether the arbitrator, knowing the law and recognizing that the law required a particular result, simply disregarded the law. *Pheng Invs., Inc.*, 196 S.W.3d at 332. It is Xtria's burden to demonstrate the arbitrator manifestly disregarded the law. *Id.*; *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 253 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

### 1. The Decision to Interpret the Tracking Systems–Xtria Settlement Agreement Was Not Manifest Disregard of the Law

Xtria contends that the arbitrator ignored the Texas principle that unambiguous contracts are enforced as written without regard to extraneous facts.[13] *Birk v. Jackson*, 75 S.W.2d 918, 922 (Tex. Civ. App.—Eastland 1934, writ dism'd). Texas law does not allow a court to ignore the clear language of an unambiguous contract. *Consol. Petroleum Partners, I, LLC v. Tindle*, 168 S.W.3d 894, 899 (Tex. App.—Tyler 2005, no pet.). An ambiguity arises where there are two reasonable interpretations of the same language in a document. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

---

[13]While Xtria argues that the arbitrator manifestly disregarded Texas law by employing California law, we find the laws of the two states to be substantially similar with respect to the issues presented in this case.

It was reasonable for the arbitrator to determine that the Tracking Systems–Xtria Settlement was ambiguous. Although the definition of "TSI" (Tracking Systems) as it was used in the agreement included all past, present, and future affiliates of Tracking Systems, the operative release by Tracking Systems failed to include this language, while the release executed by Xtria was made on behalf of "Xtria and the future assigns of all Persons within the definition of Xtria." This distinct difference, along with the fact that the release purported to address claims arising from the Tracking Systems–Xtria Asset Purchase Agreement, and any Tracking Systems–Xtria agreements, could be construed to lead to some ambiguity when the Tracking Systems–Xtria Settlement was read as a whole.

Even the parallel federal case "determined in its prior rulings that the Settlement Agreement [wa]s ambiguous." *Xtria L.L.C. v. Tracking Sys., Inc.*, No. 3:07-CV-0160-D, 2008 WL 4692855, at *1 (N.D. Tex. Oct. 23, 2008) (mem. op.). "Xtria's interpretation of the [Tracking Systems–Xtria Settlement Agreement] . . . is not the only reasonable one. [Tracking Systems's] reliance on the fact that the terms of the Release do not create explicit obligations regarding [International's] conduct has force." *Xtria L.L.C. v. Tracking Sys., Inc.*, No. 3:07-CV-0160-D, 2007 WL 2719884, at *4 (N.D. Tex. Sept. 18, 2007) (mem. op.).

After reviewing the federal opinion, indulging every inference in the arbitrator's favor, and remembering that even an egregious mistake of fact or law does not vacate an arbitrator's award, we conclude that Xtria has not met its burden to show the arbitrator's decision to interpret the Tracking

Systems–Xtria Settlement Agreement was not arbitrary and capricious or the result of a manifest disregard of the law. *JJ-CC, Ltd.*, 1998 WL 788804, at *4. In other words, the arbitrator did not manifestly disregard the law when determining that the Tracking Systems–Xtria Settlement was ambiguous.[14]

### 2. There Was No Manifest Disregard of the Law in Determining the Parties' Intent

"[A]lleged errors in the application of substantive law by the arbitrators during the proceedings in arbitration are not reviewable by the court on a motion to vacate an award." *Jamison & Harris v. Nat'l Loan Investors*, 939 S.W.2d 735, 737 (Tex. App.—Houston [14th Dist.] 1997, writ denied). Nevertheless, because he decided within his discretion that the Tracking Systems–Xtria

---

[14]During oral argument, Xtria first presented the Court with a novel argument. Attempting to assert a particular statutory ground of vacatur for the first time and in an apparent effort to circumvent the effect of the Fifth Circuit's recent ruling that nonstatutory grounds for vacatur are no longer viable, Xtria argued that the arbitrator exceeded his powers (a statutory ground for vacatur pursuant to 9 U.S.C. § 10) by manifestly disregarding the law in taking the step of effectively re-writing the Tracking Systems–Xtria Settlement and ignoring conclusive evidence on the affiliate issue. The authority of arbitrators is derived from the arbitration agreement and is limited to a decision of the matters submitted therein either expressly or by necessary implication. *Cameron Int'l Corp. v. Vetco Gray Inc.*, No. 14-07-00656-CV, 2009 WL 838177, at *9 (Tex. App.—Houston [14th Dist.] Mar. 31, 2009, no pet. h.) (mem. op.) (citing *Gulf Oil Corp. v. Guidry*, 160 Tex. 139, 143, 327 S.W.2d 406, 408 (1959)). Arbitrators exceed their powers when they decide matters that are not before them. *Barsness v. Scott*, 126 S.W.3d 232, 241 (Tex. App.—San Antonio 2003, pet. denied). Xtria has not argued the arbitrator in this case decided a matter that was not before him. Thus, not only was Xtria's argument waived, it was without merit. *Graham-Rutledge & Co. v. Nadia Corp.*, No. 05-07-01579-CV, 2009 WL 866206, at *5 (Tex. App.—Dallas Apr. 1, 2009, no pet. h.) (rejecting argument that arbitrator exceeded her powers when she "rewrote the lease contract between the parties" since it was ambiguous); *Cameron Int'l Corp.*, 2009 WL 838177, at *9 ("A complaint that the evidence does not support the arbitrator's award, however, is not a complaint that the arbitrator exceeded his powers.").

Settlement was ambiguous, the arbitrator did not manifestly disregard the law in interpreting whether the parties intended to release International's separate claims. *See JJ-CC, Ltd.*, 1998 WL 788804, at *4. Compromise and settlement agreements are subject to the general principles of the law of contracts, and thus require a meeting of the minds. *Mullins v. Mullins*, 202 S.W.3d 869, 877 (Tex. App.—Dallas 2006, pet. denied); *Stephens v. Hale,* No. 06-98-00101-CV, 1999 WL 1217878, at *3 (Tex. App.—Texarkana Dec. 21, 1999, pet. struck) (citing *Stewart v. Mathes*, 528 S.W.2d 116, 119 (Tex. Civ. App.—Beaumont 1975, no writ)). A compromise and settlement agreement does not bar suit on matters not within the contemplation of the parties. *Apex Fin. v. Brown*, 7 S.W.3d 820, 827 (Tex. App.—Texarkana 1999, no pet.). In construing a contract, the primary concern is to give effect to the parties' written intent. *Id.* at 826.

After hearing testimony of Xtria's own former vice president, and knowledge of how Xtria handled Newport's claims, the arbitrator found:

> The real issue is the intention of the parties in making the settlement agreement between [Tracking Systems] and [Xtria]. The settlement agreement does not include [International], by name, as a party that is releasing [Xtria] from claims. It easily could have been named, as it is mentioned throughout all of the pertinent documents. This omission is evidence, by itself, that [International] was never intended to be part of that agreement.

> Without any doubt, [Xtria] was well aware of the existence of [International] at the time of settlement with [Tracking Systems].

> With respect to this issue, this Court's opinion in *Dwyer v. Sabine Mining Co.* is instructive.

890 S.W.2d 140, 143 (Tex. App.—Texarkana 1994, writ denied). ABL Services, Inc., and Wayne

20

Dwyer sued Sabine Mining Company for defamatory statements made by its maintenance supervisor. *Id.* at 142. ABL settled the claims of "all employees, agents, and representatives." *Id.* at 143. Sabine argued that ABL's release barred Dwyer's suit because he was an employee. *Id.* Dwyer countered by claiming independent contractor status. *Id.* This Court stated, "Regardless of the relationship Dwyer may have had with ABL, in this suit he is pursuing his own remedies for his own injuries. Even if the release bars him from suing as an agent of ABL, he is free to sue for disparagement to his own business interests." *Id.* Similarly, International was free to sue Xtria for independent claims arising from the International Sales Agreement according to the arbitrator's rational decision.

> Using similar reasoning, the federal court also stated:

> It is important to today's case to understand that the dispute that [Tracking Systems] and Xtria were resolving in 2006 pertained to [Tracking Systems]'s rights under the earn-out provision of the APA—a controversy that arose from Xtria's sale of the eLiens business to ISO. Any potential dispute between International and Xtria concerning their separate relationship—a 2004 Sales Representative Agreement between Xtria and International—was not the subject of [Tracking Systems] and Xtria's negotiations or mediation, and they did not intend to resolve any such dispute when they entered into the Settlement Agreement.

*Xtria L.L.C.*, 2008 WL 4692855, at *3.

We give strong deference to the arbitrator's factual determination on this matter and fail to find that he ignored a clearly governing principle when determining the parties to the Tracking Systems–Xtria Settlement did not intend to release International's separate claims. *Action Indus., Inc.*, 358 F.3d at 339–40; *Am. Realty Trust, Inc.*, 74 S.W.3d at 531.

21

### 3. The Arbitrator Did Not Manifestly Disregard the Law When Deciding International Was Not a Tracking Systems Affiliate

Even had the Tracking Systems–Xtria Settlement been unambiguous (as argued by Xtria), the arbitrator still had the obligation to determine whether International was an affiliate of Tracking Systems. Xtria challenges the arbitrator's factual determination by arguing "[t]he evidence conclusively shows that [International] was an affiliate of [Tracking Systems]." Factual determinations are better left to the arbitrator. *Werline*, 209 S.W.3d at 901. Regardless, Xtria looks to the federal court findings in support of its proposition. After the state trial court confirmation of the arbitration award, partial summary judgment was granted in favor of Xtria in the parallel federal court litigation. In that federal court suit, the court ruled that Tracking Systems and International were affiliates "at least by December 2006" under Texas law and under the terms of the Tracking Systems–Xtria Settlement because they were in common control of JJJ, the family limited partnership that controlled and held more than fifty percent of the outstanding stock of both companies. Based on this ruling, Xtria asks that we vacate the state trial court's confirmation of the arbitration award.

However, the federal court noted that the state and federal cases were not entirely parallel cases since: (1) Tracking Systems was not a party to the state action and International was not a party to the federal action, and (2) the two suits involved different issues.[15] Moreover, because we

---

[15]In fact, the federal court even stated the arbitrator did not make a finding on the affiliate issue. *Xtria L.L.C.*, 2008 WL 4692855, at *6.

do not have the complete record in the federal case, additional evidence may have been presented to the federal court which was not presented to the arbitrator or to the state court.

The arbitrator's finding was duly supported. In his authority as a fact-finder, he had the capability to judge the credibility of the witnesses before him and could choose to believe the testimony of International's witnesses. In the award, he stated:

> There is evidence that Mr. Maashoff and Mr. Cooney worked closely together, shared a common office, signed documents for other entities and worked for other entities. However, at the time of the Settlement Agreement, [Tracking Systems] was not controlled by Mr. Maashoff, who had a minority 48% interest. [International] was controlled by Mr. Cooney. There was other evidence that, operationally, [Tracking Systems] was run by Mr. Maashoff and [International] was run by Mr. Cooney. But affiliate status is not determined simply on the basis of a single majority stock owner or operational control.
>
> . . . .
>
> In the end the question is whether the parties to the Settlement Agreement intend to include [International] as an affiliate of [Tracking Systems] in the release contained in the settlement agreement. The arbitrator finds they did not.
>
> For all of these reasons, the arbitrator finds that [International] was not an affiliate of [Tracking Systems] for the purposes of having released [Xtria] from all claims of [International] at the time of the [Tracking Systems] Settlement Agreement with [Xtria] in July of 2006.

"An arbitrator's judgment has the same effect as a judgment of a court of last resort; a trial court cannot substitute its judgment for that of the arbitrator's." *Id.* at 901. Nor should dictum in a parallel federal opinion, issued after confirmation, trump a rationally inferable decision made by an arbitrator. Xtria's first point of error is overruled.

23

**B.    Gross Mistake**

Gross mistake is a Texas state common-law standard that has been used to attack arbitration awards. *Callahan & Assocs. v. Orangefield Indep. Sch. Dist.*, 92 S.W.3d 841, 844 (Tex. 2002). A gross mistake implies bad faith and/or failure to exercise honest judgment on the part of an arbitrator. *Werline*, 209 S.W.3d at 897–98; *JJ-CC, Ltd.*, 1998 WL 788804, at *4. It does not mean an egregious mistake of fact or law. *JJ-CC, Ltd.*, 1998 WL 788804, at *4. Gross mistake results in a decision that is arbitrary or capricious. *Werline*, 209 S.W.3d at 898. A judgment rendered after honest consideration given to conflicting claims, no matter how erroneous, is not arbitrary or capricious. *Id.*

Xtria's arguments regarding gross mistake closely mirror those suggesting the arbitrator manifestly disregarded the law. It did not bring forth any evidence to suggest the arbitrator's decision was made in bad faith, or that the arbitrator failed to exercise honest judgment. A review of the arbitration record and award demonstrates the arbitrator considered conflicting claims and relevant law after hearing evidence and requesting post-hearing briefs. For the reasons employed above, we do not find the arbitrator's decision was arbitrary or capricious. Xtria's second point of error is overruled.

**C.    Attorney's Fees**

International seeks attorney's fees under Rule 45 of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 45. In the pursuit of such relief, it is International's burden to show that Xtria

"had no reasonable ground to believe that the judgment would be reversed." *In re Estate of Davis*, 216 S.W.3d 537, 548 (Tex. App.—Texarkana 2007, pet. denied); *St. Louis Sw. Ry. Co. v. Marks*, 749 S.W.2d 911, 915 (Tex. App.—Texarkana 1998, pet. denied). In order for this Court to award the requested $25,000, it must first find that Xtria's appeal is frivolous. TEX. R. APP. P. 45. We do not make such a finding. Even though Xtria's argument failed to convince this Court, it had a reasonable basis in law and constituted an informed, good-faith challenge to the trial court's judgment. *Davis*, 216 S.W.3d at 548; *Long Trusts v. Atl. Richfield Co.*, 893 S.W.2d 686, 689 (Tex. App.—Texarkana 1995, no writ). Therefore, Rule 45 sanctions are inappropriate.

## V. CONCLUSION

We affirm the trial court's judgment confirming the arbitration award.

Bailey C. Moseley
Justice

Date Submitted: April 30, 2009
Date Decided: May 15, 2009

25