In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00073-CV


______________________________




XTRIA L.L.C., Appellant



V.



INTERNATIONAL INSURANCE ALLIANCE INCORPORATED, Appellee




 


On Appeal from the 14th Judicial District Court


Dallas County, Texas


Trial Court No. 08-00954-A




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 Xtria, L.L.C. (Xtria) appeals the trial court's refusal to vacate a commercial arbitration award
made in favor of International Insurance Alliance Incorporated (International) in the amount of
$1,350,000. (1) In its appellate brief, Xtria claims that the arbitrator made a gross mistake and/or
manifestly disregarded the law because International's claims were barred due to a previous
settlement entered into between Xtria and International's subsidiary. 

I. FACTUAL AND PROCEDURAL HISTORY

 A. 2000 Xtria-Tracking Systems Contract

 A software product was designed by e.Liens, Inc., for insurance companies that electronically
notified mortgagees and lienholders if a borrower failed to comply with insurance requirements
specified in their loan agreements. Tracking Systems, Inc., acquired this software through the
purchase of all e.Liens, Inc., stock. In 2000, Tracking Systems sold this software to Xtria's
predecessor pursuant to an Asset Purchase Agreement. This agreement contained a provision that
allowed Tracking Systems a right to twenty percent of the increase in value of the e.Liens software
if Xtria ever sold it to another party ("earn-out provision"). 

 B. 2004 Xtria-International Contract 

 In 2004, Xtria and Tracking Systems's parent company, International, (2) entered into a Sales
Representative Agreement (International Sales Agreement) whereby International agreed to act as
Xtria's "agent . . . with respect to all software, information systems, products and services, together
with all updates, revisions and improvements," and as "non-exclusive agent for the sale of Products
in North America." International was also to "assist [Xtria] by soliciting and marketing . . . the
Products within the Product Territory." (3) In exchange, International would receive fifteen percent
"commission, in perpetuity, for the sale of [Xtria's] Products." Further, the contract allowed
International to have exclusive marketing rights within twelve months of termination. These
provisions were designed to protect International from the possibility that it would expend its time
and effort to develop the marketing of the product only to have Xtria then abruptly sell the product
to a third party who would benefit from International's efforts, thereby depriving International of the
fruits of its labors expended in obtaining prospective buyers. (4) 

 C. Xtria Sells e.Liens Business 

 Xtria sold the software to ISO Claims Service, Inc. in 2005, triggering obligations under both
the agreement with Tracking Systems and the agreement with International. 

 Since there were several insurance companies negotiating to sign on to use the e.Liens
product, and ISO would benefit from these new customers, International believed that ISO would
assume the contract, even after the 2005 sale had been completed. A schedule to the ISO Purchase
Agreement clarified that Xtria was retaining the International Sales Agreement. However, ISO,
which had its own sales force, did not assume the International Sales Agreement. Upon learning of
the sale, Tracking Systems demanded that Xtria pay it what it said that it believed it had coming to
it under the earn-out provision, but the parties disagreed as to the amount of money Xtria owed
Tracking Systems. It resulted in a July 2006 mediated Settlement Agreement and Release (Tracking
Systems-Xtria Settlement) that awarded Tracking Systems $555,000. Tracking Systems's release
disposed of all "past, present and future claims," whether known or unknown, "relating to or arising
from (i) the [Tracking Systems]-Xtria Agreement, (5) and/or (ii) any oral or other written agreement
between [Tracking Systems] and Xtria." The definition of Tracking Systems and Xtria included
"past, present and future affiliates." While the release executed by Xtria included "Xtria and the
future assigns of all Persons within the definition of Xtria . . . ," Tracking Systems's release did not
include such language. Nevertheless, Xtria argues that this release covers independent claims made
by International arising from the facts set out below. 

 In December 2006, asserting that it could have received commissions in connection with
sales of the e.Liens product, International alleged that Xtria breached the International Sales
Agreement to market the software. International invoked the contract's arbitration clause, filed an
arbitration demand with the American Arbitration Association, and a California arbitrator was
chosen to mediate the case. 

 In February 2007, Xtria brought suit aginst Tracking Systems (not International) in the United
States District Court for the Northern District of Texas seeking a declaration that the Tracking
Systems-Xtria Settlement discharged and extinguished Xtria's liability to International since it
resolved claims that could be asserted by "past, present and future affiliates" of Tracking Systems. 
At the same time, Xtria moved the California arbitrator to stay its arbitration with International until
the federal case against Tracking Systems was resolved.

 D. Procedural History of the Arbitration

 The arbitrator denied the motion to stay but told Xtria it could present evidence on the
affiliate issue at the evidentiary hearing. The arbitrator reasoned: 

 [O]wnership or management, if such be the case, does not make one entity an
affiliate of another. In California, a corporation is an affiliate of another corporation
"if it is directly, or indirectly through one or more intermediaries, controls, is
controlled by or is under common control with the other specified corporation." 
Corp. Code § 150. The essence of an affiliate is control. Here there is a lack of proof
of such control. (6) 


 1. The Affiliate Issue 

 The arbitration hearing on International's claims and the "affiliate defense" raised by Xtria
commenced December 10, 2007, and continued for four days. In it, Xtria argued that International
and Tracking Systems had common control. Barry Maashoff was president of Tracking Systems and
served as International's secretary, treasurer, and chairman of its board of directors. Mike Cooney
was president of International and there is some evidence that Cooney was also involved with
Tracking Systems at a managerial level. A business plan developed during Tracking Systems's
acquisition of e.Liens listed Cooney as the CEO/manager "managing this business day to day" and
outlined his respective responsibilities. (7) Maashoff's and Cooney's positions allowed them to sign
off on documents for both International and Tracking Systems interchangeably. For example,
Cooney signed the e.Liens acquisition documents for Tracking Systems as an officer authorized by
Maashoff "for this one project" while Maashoff signed off on International documents instead of
Cooney. Based on Maashoff's and Cooney's close connection to both companies, Xtria argued that
Tracking Systems and International were commonly controlled. 

 Next, Xtria tried to establish International's affiliation with Tracking Systems through
evidence of stock ownership by Maashoff and Cooney. Xtria demonstrated that Maashoff owned
forty-one percent and Cooney owned ten percent of the Tracking Systems stock--enough to
collectively give them majority shareholder status. Then, Xtria demonstrated that because Maashoff
owned sixty percent of International through his family company JenJeffJo (JJJ), and Cooney owned
the other forty percent, they were also majority shareholders of International. Xtria claims the
majority ownership of both companies amounted to control, evidencing International's affiliation
with Tracking Systems. Finally, Xtria also pointed out that International, Tracking Systems, Cooney,
and Maashoff officed in the same building.

 International countered by claiming that there was no evidence that Tracking Systems and
International were related, worked toward the same goal, or that there was mutual control. Tracking
Systems stated "[International] is not an affiliate of [Tracking Systems] . . . [they] have separate
corporate structures, different shareholders, and different members on the board of
directors.  . . . [Tracking Systems] has no control or authority over [International] and cannot dictate
its actions." Cooney testified that he owned International and called the shots, characterizing
Maashoff as just an investor. 

 2. The Intent of the Parties 

 There was also testimony about the parties' intent when Tracking Systems and Xtria entered
into the settlement agreement. Howard Wadsworth, an officer of Xtria, stated he would not have 
recommended that Xtria agree to pay $555,000 under the Tracking Systems-Xtria Settlement unless
he believed that the settlement successfully exculpated Xtria from any liability for subsequent claims
by International. 

 Wadsworth's testimony was countered by the testimony of Kenneth Owensby, a former vice
president of Xtria, who was responsible on behalf of Xtria for the sale of e.Liens and who had
negotiated and signed the International Sales Agreement on its behalf. Owensby testified that the
agreement was a back-end-weighted deal (meaning that International would not get the typical front-end commission, but would collect revenues as transactions processed and throughout the term of
the insurance company's agreement). He further explained that this kind of arrangement motivated
companies like International to not only make the initial sale of the software, but to continue to
service the business in order to keep the insurance company clients who purchased it satisfied. 
Because of this type of arrangement, Owensby stated that when e.Liens was sold, either ISO could
assume the obligation under the International contract or, if not, Xtria would either be forced to buy
International out of its deferred payment or somehow otherwise compensate them. (8) 

 Moreover, because there was evidence in the record that Xtria paid Newport, a third-party
broker similar to International, for similar claims in another settlement, International argued that
Xtria should have anticipated that International's claims would be filed. Despite this prior
experience, International argued that Xtria did not expressly include International's claim in the
Tracking Systems-Xtria Settlement because Xtria never contemplated that the Tracking Systems
release would apply to International. 

 3. The Arbitrator's Award

 At the conclusion of the lengthy hearing and after reviewing post-hearing briefs, the arbitrator
found that Xtria had breached the International Sales Agreement and awarded International
$1,350,000 on January 18, 2008. In determining that all obligations were still owed to International
irrespective of Xtria's sale of the business to ISO, the arbitrator reasoned that "modification of the
[International Sales Agreement] requires the written agreement of both parties." Since no
modification was made, Xtria owed International all commissions as specified in the International
Sales Agreement. The arbitrator also found that Tracking Systems and International were not
affiliates and that neither Tracking Systems nor Xtria intended for the Tracking Systems-Xtria
Settlement to bar International from seeking relief on separate claims. 

 E. State Court Proceeding in Dallas 

 While International filed a motion for confirmation of the award, Xtria filed a motion asking
the trial court to vacate the arbitration award due to the arbitrator's "Evident Partiality," "Gross
Mistake," and "Manifest Disregard for the Law" when ruling on the affiliate issue. (9) The trial court
granted International's motion to confirm the arbitration award on March 12, 2008. In its findings
of fact and conclusions of law supporting the confirmation, the trial court noted that "Xtria does not
claim that the Arbitrator used an incorrect definition for 'affiliate,' but rather that he misapplied the
law to the facts and 'ignored a mountain of conclusive evidence and stipulations to the contrary.'"

II. GENERAL STANDARD OF REVIEW

 An arbitration award is conclusive "on the parties as to all matters of fact and law because
the award has the effect of a judgment of a court of last resort." Powell v. Gulf Coast Carriers, Inc.,
872 S.W.2d 22, 24 (Tex. App.--Houston [14th Dist.] 1994, no writ). This Court's review of an
arbitrator's findings is "extraordinarily narrow." Werline v. E. Tex. Salt Water Disposal Co., 209
S.W.3d 888, 897 (Tex. App.--Texarkana 2006, pet. granted). Because arbitration is a favored
means of dispute resolution, every reasonable presumption is indulged in favor of upholding the
arbitration award. Id.; JJ-CC, Ltd. v. Transwestern Pipeline Co., No. 14-96-1103-CV, 1998
WL 788804, at *4 (Tex. App.--Houston [14th Dist.] Nov. 12, 1998, no pet.) (not designated for
publication). 

 Review is so limited that a mistake of fact or law or failure to correctly apply the law will not
justify vacating an arbitrator's award. Werline, 209 S.W.3d at 897; Crossmark, Inc. v. Hazar, 124
S.W.3d 422, 434-35 (Tex. App.--Dallas 2004, pet. denied). We are not limited to the arbitrator's
explanation for his award. JJ-CC, Ltd., 1998 WL 788804, at *4. Rather, we look to the result
achieved and determine whether the arbitration award is "rationally inferable." Id.; see also
Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1320 (5th Cir. 1994). 

 Additionally, we review de novo a trial court's confirmation of an arbitration award while
giving strong deference to the arbitrator with respect to issues properly left to the arbitrator's
resolution. Action Indus., Inc. v. U.S. Fid. & Guar. Co., 358 F.3d 337, 339-40 (5th Cir. 2004); Am.
Realty Trust, Inc. v. JDN Real Estate-McKinney, L.P., 74 S.W.3d 527, 531 (Tex. App.--Dallas
2002, pet. denied). 

III. VACATUR STANDARDS

 Both parties agree that this is a dispute arising from a matter involving interstate commerce. 
As conceded, the Federal Arbitration Act (FAA) applies. In re L.L. Kempwood Assocs., L.P.,
9 S.W.3d 125, 127 (Tex. 1999). Under the FAA, an arbitration award may be vacated if:

 (1) it was procured by corruption, fraud, or undue means; 


 (2) there was evident partiality or corruption on the part of the arbitrators; 


 (3) the arbitrators were guilty of misconduct in refusing to postpone a hearing or hear
evidence pertinent to the controversy which resulted in prejudice to a party; and 


 (4) the arbitrators exceeded their powers or no definite award was made.


9 U.S.C. § 10 (West, Westlaw through April 24, 2009). 


 No statutory grounds of vacatur were raised in this appeal. Instead, we address Xtria's
question whether state and federal common-law vacatur standards apply in addition to the FAA's
statutory standards. 

 After the FAA was enacted, some federal courts added common-law grounds for vacatur,
including an arbitrator's manifest disregard of the law. Action Box Co. v. Panel Prints, Inc., 130
S.W.3d 249, 252 (Tex. App.--Houston [14th Dist.] 2004, no pet.) (referring to Shearson/American
Express, Inc. v. McMahon, 482 U.S. 220, 231 (1987)) (manifest disregard standard is "a federal
common law doctrine, the underlying rationale for which the United States Supreme Court has
largely rejected as reflecting a general suspicion of the desirability of arbitration and competence of
arbitration tribunals"). State courts followed suit. The San Antonio, Dallas, Fort Worth, Amarillo,
and Tyler Courts of Appeals adopted the use of this federal common-law "exception[] recognized
by the Fifth Circuit" for cases decided under the FAA. Galvan v. Centex Home Equity Co., No. 04-06-00820-CV, 2008 WL 441773, at *3 (Tex. App.--San Antonio Feb. 20, 2008, no pet.) (mem. op.);
Roehrs v. FSI Holdings, Inc., 246 S.W.3d 796, 814 (Tex. App.--Dallas 2008, pet. denied); Banc of
Am. Invs. Servs., Inc. v. Lancaster, No. 2-06-314-CV, 2007 WL 2460277, at *7 (Tex. App.--Fort
Worth, Aug. 31, 2007, no pet.) (mem. op.); P. McGregor Enters., Inc. v. Denman Bldg. Prods., Ltd.,
No. 07-05-0385-CV, 2007 WL 1201545, at *5 (Tex. App.--Amarillo Apr. 24, 2007, pet. denied);
John M. O'Quinn, P.C. v. Wood, Nos. 12-06-00151-CV, 12-06-00188-CV, 2006 WL 3735617, at
*2 (Tex. App.--Tyler Dec. 20, 2006, no pet.) (mem. op.). 

 State courts also developed other common-law vacatur standards such as fraud, misconduct,
and "such gross mistake as would imply bad faith" and/or "failure to exercise honest judgment." 
Werline, 209 S.W.3d at 897-98. Traditionally, unless an issue of pre-emption was involved, both
Federal and State laws were implicated where an arbitration agreement failed to specify which was
to be employed. (10) In re D. Wilson Constr. Co., 196 S.W.3d 774, 779 (Tex. 2006); Action Box Co.,
130 S.W.3d at 252 n.5 ("[T]he federal act preempts all otherwise applicable state laws . . . the state
law standard under the CPRC and the federal common law standard could not apply in the same
case . . . .").

 However, a recent United States Supreme Court case has called into question the application
of common-law vacatur grounds where the FAA applies. The Supreme Court's decision in Hall
Street Associates, L.L.C. v. Mattel, Inc., rejected the theory that parties could contract to modify FAA
standards for vacatur and held that "§§10 and 11 respectively provide the FAA's exclusive grounds
for expedited vacatur and modification." (11) ___ U.S. ____, 128 S.Ct. 1396, 1402 (2008). Although
not specifically in issue, Hall discussed the manifest disregard standard as first presented by Wilko
v. Swan, 346 U.S. 427 (1953), overruled by Quijas v. Shearson/American Express, Inc., 490 U.S.
477, 484 (1989). Hall, 128 S.Ct. at 1403. The Supreme Court decision discussed the split among
federal circuits on the issue of whether manifest disregard was a new ground that could be used to
overturn an arbitrator's decision under Wilko and decided (albeit in dictum) that it was not. Hall, 128
S.Ct. at 1404. 

 Hall noted:

 [i]n holding that §§ 10 and 11 provide exclusive regimes for the review provided by
the statute, we do not purport to say that they exclude more searching review based
on authority outside the statute as well. The FAA is not the only way into court for
parties wanting review of arbitration awards: they may contemplate enforcement
under state statutory or common law, for example, where judicial review of different
scope is arguable.  But here we speak only to the scope of the expeditious judicial
review under §§ 9, 10, and 11, deciding nothing about other possible avenues for
judicial enforcement of arbitration awards.


Id. 

 Also, Hall did not expressly overrule or even clarify the rulings in some Texas courts that
common-law grounds, including gross mistake, are cumulative of statutory grounds for vacatur. 
Werline, 209 S.W.3d at 898; Pheng Invs., Inc. v. Rodriquez, 196 S.W.3d 322, 328-29 (Tex.
App.--Fort Worth 2006, no pet.); Int'l Bank of Commerce-Brownsville v. Int'l Energy Dev., 981
S.W.2d 38, 47-48 (Tex. App.--Corpus Christi 1998, pet. denied). But see Quinn, 257 S.W.3d at
799 n.3 (expressing no opinion on whether common-law grounds are available with respect to
arbitration covered by the Texas General Arbitration Act and recognizing that the issue of "whether
common law grounds are preempted by the TAA . . . has yet to be decided by the Texas Supreme
Court"). 

 The language in Hall caused much confusion in federal circuits and resulted in further split
decisions regarding the applicability of manifest disregard as a federal nonstatutory "common law"
ground for vacatur, separate and apart from FAA arbitration. See Stolt-Nielsen SA v. AnimalFeeds
Int'l Corp., No. 06-3474-CV, 2008 WL 4779582, at *6-8 (2d Cir. Nov. 4, 2008) (general discussion
regarding split among circuits). In March of this year, the Fifth Circuit resolved this question due
to differing opinions in federal district courts in Texas. Millmaker v. Bruso, No. H-07-3837, 2008
WL 4560624, at *6 n.8 (S.D. Tex. Oct. 9, 2008); Wood v. Penntex Res. LP, No. H-06-2198, 2008
WL 2609319, at *8 n.4 (S.D. Tex. June 27, 2008) ("Hall Street overrules Fifth Circuit precedent
establishing manifest disregard of clearly applicable law as an additional ground for vacatur distinct
from the explicitly enumerated statutory grounds"); (12) Householder Group v. Caughran, 576
F.Supp.2d 796, 800 (E.D. Tex. 2008) (failing to apply manifest disregard standard after recognizing
Hall called it into doubt). 

 The Fifth Circuit held that manifest disregard vacatur ground is no longer a "federal common
law" standard, and state law to the contrary is pre-empted. Citigroup Global Mkts., Inc. v. Bacon,
562 F.3d 349, 355 (5th Cir. 2009). As noted previously, this case was transferred to this Court from
the Dallas Court of Appeals and we are obligated to "decide the case in accordance with the
precedent of the transferor court under principles of stare decisis." Tex. R. App. P. 41.3. The Dallas
Court of Appeals has based its application of the manifest disregard standard on Fifth Circuit
precedent. See Roehrs, 246 S.W.3d at 814; Myer v. Americo Life, Inc., 232 S.W.3d 401, 410-11
(Tex. App.--Dallas 2007, no pet.). Following that precedent, we could conceivably apply the Fifth
Circuit's rulings here. 

 However, Texas courts of appeals are not necessarily bound under stare decisis to follow
rulings of the Fifth Circuit--even on federal issues--and the Hall Street opinion has provided mixed
results. Dewey v. Wegner, 138 S.W.3d 591, 601 (Tex. App.--Houston [14th Dist.] 2004, no pet.)
(citing Penrod Drilling Corp. v. Williams, 868 S.W.2d 294, 296 (Tex. 1993) (per curiam)). 
Therefore, rather than attempt to auger the minds of the Dallas Court of Appeals on this matter, we
will decide this case based on current Dallas court precedent, which recognizes both manifest
disregard of the law as well as gross mistake as grounds for vacatur of an arbitrator's decision. Thus, without making a determination that the so-called common-law grounds for vacatur
no longer exist and, since the outcome of this dispute remains the same under either analysis, in the
attitude of cautiously donning both a belt and suspenders, we address the merits of Xtria's complaint
that the arbitrator manifestly disregarded the law and committed a gross mistake when effectively
"rewriting" an unambiguous settlement agreement and interpreting that the parties intended to
exclude International as an affiliate of Tracking Systems. 

IV. APPLICATION 

 A. Manifest Disregard

 Manifest disregard is a very narrow standard of review. Home Owners Mgmt. Enters., Inc.
v. Dean, 230 S.W.3d 766, 768-69 (Tex. App.--Dallas 2007, no pet.). It is more than error or
misunderstanding of the law. Galvan, 2008 WL 441773, at *3; Home Owners Mgmt., 230 S.W.3d
at 768. The error must be "obvious and capable of being readily and instantly perceived by the
average person qualified to serve as an arbitrator." Galvan, 2008 WL 441773, at *3. Under this
standard, the arbitrator recognizes a clearly governing principle and ignores it. Id. In other words,
the issue is not whether the arbitrator correctly interpreted the law, but whether the arbitrator,
knowing the law and recognizing that the law required a particular result, simply disregarded the law. 
Pheng Invs., Inc., 196 S.W.3d at 332. It is Xtria's burden to demonstrate the arbitrator manifestly
disregarded the law. Id.; Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P., 105 S.W.3d 244,
253 (Tex. App.--Houston [14th Dist.] 2003, pet. denied). 

 1. The Decision to Interpret the Tracking Systems-Xtria Settlement
Agreement Was Not Manifest Disregard of the Law


 Xtria contends that the arbitrator ignored the Texas principle that unambiguous contracts are
enforced as written without regard to extraneous facts. (13) Birk v. Jackson, 75 S.W.2d 918, 922 (Tex.
Civ. App.--Eastland 1934, writ dism'd). Texas law does not allow a court to ignore the clear
language of an unambiguous contract. Consol. Petroleum Partners, I, LLC v. Tindle, 168 S.W.3d
894, 899 (Tex. App.--Tyler 2005, no pet.). An ambiguity arises where there are two reasonable
interpretations of the same language in a document. Lopez v. Munoz, Hockema & Reed, L.L.P., 22
S.W.3d 857, 861 (Tex. 2000). 

 It was reasonable for the arbitrator to determine that the Tracking Systems-Xtria Settlement
was ambiguous. Although the definition of "TSI" (Tracking Systems) as it was used in the
agreement included all past, present, and future affiliates of Tracking Systems, the operative release
by Tracking Systems failed to include this language, while the release executed by Xtria was made
on behalf of "Xtria and the future assigns of all Persons within the definition of Xtria." This distinct
difference, along with the fact that the release purported to address claims arising from the Tracking
Systems-Xtria Asset Purchase Agreement, and any Tracking Systems-Xtria agreements, could be
construed to lead to some ambiguity when the Tracking Systems-Xtria Settlement was read as a
whole. 

 Even the parallel federal case "determined in its prior rulings that the Settlement Agreement
[wa]s ambiguous." Xtria L.L.C. v. Tracking Sys., Inc., No. 3:07-CV-0160-D, 2008 WL 4692855,
at *1 (N.D. Tex. Oct. 23, 2008) (mem. op.). "Xtria's interpretation of the [Tracking Systems-Xtria
Settlement Agreement] . . . is not the only reasonable one. [Tracking Systems's] reliance on the fact
that the terms of the Release do not create explicit obligations regarding [International's] conduct has
force." Xtria L.L.C. v. Tracking Sys., Inc., No. 3:07-CV-0160-D, 2007 WL 2719884, at *4 (N.D.
Tex. Sept. 18, 2007) (mem. op.). 

 After reviewing the federal opinion, indulging every inference in the arbitrator's favor, and
remembering that even an egregious mistake of fact or law does not vacate an arbitrator's award, we
conclude that Xtria has not met its burden to show the arbitrator's decision to interpret the Tracking
Systems-Xtria Settlement Agreement was not arbitrary and capricious or the result of a manifest
disregard of the law. JJ-CC, Ltd., 1998 WL 788804, at *4. In other words, the arbitrator did not
manifestly disregard the law when determining that the Tracking Systems-Xtria Settlement was
ambiguous. (14) 

 2. There Was No Manifest Disregard of the Law in Determining the
Parties' Intent


 "[A]lleged errors in the application of substantive law by the arbitrators during the
proceedings in arbitration are not reviewable by the court on a motion to vacate an award." Jamison
& Harris v. Nat'l Loan Investors, 939 S.W.2d 735, 737 (Tex. App.--Houston [14th Dist.] 1997, writ
denied). Nevertheless, because he decided within his discretion that the Tracking Systems-Xtria
Settlement was ambiguous, the arbitrator did not manifestly disregard the law in interpreting whether
the parties intended to release International's separate claims. See JJ-CC, Ltd., 1998 WL 788804,
at *4. Compromise and settlement agreements are subject to the general principles of the law of
contracts, and thus require a meeting of the minds. Mullins v. Mullins, 202 S.W.3d 869, 877 (Tex.
App.--Dallas 2006, pet. denied); Stephens v. Hale, No. 06-98-00101-CV, 1999 WL 1217878, at *3
(Tex. App.--Texarkana Dec. 21, 1999, pet. struck) (citing Stewart v. Mathes, 528 S.W.2d 116, 119
(Tex. Civ. App.--Beaumont 1975, no writ)). A compromise and settlement agreement does not bar
suit on matters not within the contemplation of the parties. Apex Fin. v. Brown, 7 S.W.3d 820, 827
(Tex. App.--Texarkana 1999, no pet.). In construing a contract, the primary concern is to give effect
to the parties' written intent. Id. at 826. 

 After hearing testimony of Xtria's own former vice president, and knowledge of how Xtria
handled Newport's claims, the arbitrator found:

 The real issue is the intention of the parties in making the settlement agreement
between [Tracking Systems] and [Xtria]. The settlement agreement does not include
[International], by name, as a party that is releasing [Xtria] from claims. It easily
could have been named, as it is mentioned throughout all of the pertinent documents. 
This omission is evidence, by itself, that [International] was never intended to be part
of that agreement. 


 Without any doubt, [Xtria] was well aware of the existence of [International] at the
time of settlement with [Tracking Systems].

 With respect to this issue, this Court's opinion in Dwyer v. Sabine Mining Co. is instructive. 
890 S.W.2d 140, 143 (Tex. App.--Texarkana 1994, writ denied). ABL Services, Inc., and Wayne
Dwyer sued Sabine Mining Company for defamatory statements made by its maintenance supervisor.
Id. at 142. ABL settled the claims of "all employees, agents, and representatives." Id. at 143. 
Sabine argued that ABL's release barred Dwyer's suit because he was an employee. Id. Dwyer
countered by claiming independent contractor status. Id. This Court stated, "Regardless of the
relationship Dwyer may have had with ABL, in this suit he is pursuing his own remedies for his own
injuries. Even if the release bars him from suing as an agent of ABL, he is free to sue for
disparagement to his own business interests." Id. Similarly, International was free to sue Xtria for
independent claims arising from the International Sales Agreement according to the arbitrator's
rational decision. 

 Using similar reasoning, the federal court also stated:

 It is important to today's case to understand that the dispute that [Tracking Systems]
and Xtria were resolving in 2006 pertained to [Tracking Systems]'s rights under the
earn-out provision of the APA--a controversy that arose from Xtria's sale of the
eLiens business to ISO. Any potential dispute between International and Xtria
concerning their separate relationship--a 2004 Sales Representative Agreement
between Xtria and International--was not the subject of [Tracking Systems] and
Xtria's negotiations or mediation, and they did not intend to resolve any such dispute
when they entered into the Settlement Agreement. 


Xtria L.L.C., 2008 WL 4692855, at *3. 

 We give strong deference to the arbitrator's factual determination on this matter and fail to
find that he ignored a clearly governing principle when determining the parties to the Tracking
Systems-Xtria Settlement did not intend to release International's separate claims. Action Indus.,
Inc., 358 F.3d at 339-40; Am. Realty Trust, Inc., 74 S.W.3d at 531. 

 3. The Arbitrator Did Not Manifestly Disregard the Law When Deciding
International Was Not a Tracking Systems Affiliate


 Even had the Tracking Systems-Xtria Settlement been unambiguous (as argued by Xtria),
the arbitrator still had the obligation to determine whether International was an affiliate of Tracking
Systems. Xtria challenges the arbitrator's factual determination by arguing "[t]he evidence
conclusively shows that [International] was an affiliate of [Tracking Systems]." Factual
determinations are better left to the arbitrator. Werline, 209 S.W.3d at 901. Regardless, Xtria looks
to the federal court findings in support of its proposition. After the state trial court confirmation of
the arbitration award, partial summary judgment was granted in favor of Xtria in the parallel federal
court litigation. In that federal court suit, the court ruled that Tracking Systems and International
were affiliates "at least by December 2006" under Texas law and under the terms of the Tracking
Systems-Xtria Settlement because they were in common control of JJJ, the family limited
partnership that controlled and held more than fifty percent of the outstanding stock of both
companies. Based on this ruling, Xtria asks that we vacate the state trial court's confirmation of the
arbitration award. 

 However, the federal court noted that the state and federal cases were not entirely parallel
cases since: (1) Tracking Systems was not a party to the state action and International was not a
party to the federal action, and (2) the two suits involved different issues. (15) Moreover, because we
do not have the complete record in the federal case, additional evidence may have been presented
to the federal court which was not presented to the arbitrator or to the state court. 

 The arbitrator's finding was duly supported. In his authority as a fact-finder, he had the
capability to judge the credibility of the witnesses before him and could choose to believe the
testimony of International's witnesses. In the award, he stated:

 There is evidence that Mr. Maashoff and Mr. Cooney worked closely together, shared
a common office, signed documents for other entities and worked for other entities. 
However, at the time of the Settlement Agreement, [Tracking Systems] was not
controlled by Mr. Maashoff, who had a minority 48% interest. [International] was
controlled by Mr. Cooney. There was other evidence that, operationally, [Tracking
Systems] was run by Mr. Maashoff and [International] was run by Mr. Cooney. But
affiliate status is not determined simply on the basis of a single majority stock owner
or operational control. 


 . . . . 


 In the end the question is whether the parties to the Settlement Agreement
intend to include [International] as an affiliate of [Tracking Systems] in the release
contained in the settlement agreement. The arbitrator finds they did not. 

 

 For all of these reasons, the arbitrator finds that [International] was not an
affiliate of [Tracking Systems] for the purposes of having released [Xtria] from all
claims of [International] at the time of the [Tracking Systems] Settlement Agreement
with [Xtria] in July of 2006. 

 "An arbitrator's judgment has the same effect as a judgment of a court of last resort; a trial
court cannot substitute its judgment for that of the arbitrator's." Id. at 901. Nor should dictum in a
parallel federal opinion, issued after confirmation, trump a rationally inferable decision made by an
arbitrator. Xtria's first point of error is overruled. 

 B. Gross Mistake

 Gross mistake is a Texas state common-law standard that has been used to attack arbitration
awards. Callahan & Assocs. v. Orangefield Indep. Sch. Dist., 92 S.W.3d 841, 844 (Tex. 2002). A
gross mistake implies bad faith and/or failure to exercise honest judgment on the part of an arbitrator. 
Werline, 209 S.W.3d at 897-98; JJ-CC, Ltd., 1998 WL 788804, at *4. It does not mean an egregious
mistake of fact or law. JJ-CC, Ltd., 1998 WL 788804, at *4. Gross mistake results in a decision that
is arbitrary or capricious. Werline, 209 S.W.3d at 898. A judgment rendered after honest
consideration given to conflicting claims, no matter how erroneous, is not arbitrary or capricious. 
Id. 

 Xtria's arguments regarding gross mistake closely mirror those suggesting the arbitrator
manifestly disregarded the law. It did not bring forth any evidence to suggest the arbitrator's decision
was made in bad faith, or that the arbitrator failed to exercise honest judgment. A review of the
arbitration record and award demonstrates the arbitrator considered conflicting claims and relevant
law after hearing evidence and requesting post-hearing briefs. For the reasons employed above, we
do not find the arbitrator's decision was arbitrary or capricious. Xtria's second point of error is
overruled. 

 C. Attorney's Fees 

 International seeks attorney's fees under Rule 45 of the Texas Rules of Appellate Procedure. 
See Tex. R. App. P. 45. In the pursuit of such relief, it is International's burden to show that Xtria
"had no reasonable ground to believe that the judgment would be reversed." In re Estate of Davis,
216 S.W.3d 537, 548 (Tex. App.--Texarkana 2007, pet. denied); St. Louis Sw. Ry. Co. v. Marks, 749
S.W.2d 911, 915 (Tex. App.--Texarkana 1998, pet. denied). In order for this Court to award the
requested $25,000, it must first find that Xtria's appeal is frivolous. Tex. R. App. P. 45. We do not
make such a finding. Even though Xtria's argument failed to convince this Court, it had a reasonable
basis in law and constituted an informed, good-faith challenge to the trial court's judgment. Davis,
216 S.W.3d at 548; Long Trusts v. Atl. Richfield Co., 893 S.W.2d 686, 689 (Tex. App.--Texarkana
1995, no writ). Therefore, Rule 45 sanctions are inappropriate. 

V. CONCLUSION

 We affirm the trial court's judgment confirming the arbitration award. 



 Bailey C. Moseley

 Justice


Date Submitted: April 30, 2009

Date Decided: May 15, 2009

 
1. This case was transferred to this Court from the Fifth District Court of Appeals in Dallas as
part of the Texas Supreme Court's docket equalization program. Except as noted and considered
below, we are not aware of any conflict between the precedent of the Dallas Court and the precedent
of this Court on any issue relevant in this appeal. See Tex. R. App. P . 41.3.
2. International is a holding company. 
3. Nothing in this contract limits International's responsibilities to the e.Liens software product.
4. Prior to the International Sales Agreement, e.Liens was worth $300,000-$400,000. It sold
for $5.4 million. 
5. The Tracking Systems-Xtria Agreement was defined as the Asset Purchase Agreement
entered into by Tracking Systems dated June 1, 2000.
6. Xtria acknowledged the California Code definition of "affiliate" is the same in Texas. Tex.
Bus. Orgs. Code Ann. § 1.002(1) (Vernon 2008). 
7. From 1999-2000, Cooney was involved in the e.Liens business with Tracking Systems and
may have managed it for a period of six months. Cooney claimed this business plan was not put into
place and that he probably put the plan together to help Maashoff. Some Tracking Systems
documents also list Cooney as secretary, although he claims "this was . . . purely an administrative
function" and does not remember being on the board of Tracking Systems. 
8. Owensby explained why Xtria should have bought out International. The e.Liens package
was attached to the International Sales Agreement calling for fifteen percent commission to
International. Since ISO already had a sales force, the package was automatically worth fifteen
percent more to them than it should have been, thereby elevating the built-in revenue stream. Xtria
knew and benefitted from this because the value of the e.Liens package they were selling also
increased by fifteen percent. Cooney presents the theory that under the International Sales
Agreement, International exclusively owned the marketing rights which Xtria did not have the right
to sell to ISO without justly compensating International. 
9. The evident partiality issue was abandoned on appeal. 
10. While the International Sales Agreement contained a Texas choice of law clause, the United
States Fifth Circuit and the Texas Supreme Court have held "an arbitration clause and a generic
choice-of-law clause . . . [do not] demonstrate a clear intent to displace the FAA's vacatur standards
and replace them with ones borrowed from [state] law." Action Indus., Inc., 358 F.3d at 340, 342.
11. Similarly, the Texas General Arbitration Act cannot expand grounds for review beyond
those enumerated in contract. Quinn v. Nafta Trades, Inc., 257 S.W.3d 795, 799 (Tex. App.--Dallas
2008, pet. filed). 
12. The Southern District developed this view after abandoning previous post-Hall applications
of manifest disregard. Halliburton Energy Servs., Inc. v. NL Indus., 553 F.Supp.2d 733, 753 (S.D.
Tex. 2008) (applying manifest disregard standard "out of an abundance of caution").
13. While Xtria argues that the arbitrator manifestly disregarded Texas law by employing
California law, we find the laws of the two states to be substantially similar with respect to the issues
presented in this case. 
14. During oral argument, Xtria first presented the Court with a novel argument. Attempting
to assert a particular statutory ground of vacatur for the first time and in an apparent effort to
circumvent the effect of the Fifth Circuit's recent ruling that nonstatutory grounds for vacatur are no
longer viable, Xtria argued that the arbitrator exceeded his powers (a statutory ground for vacatur
pursuant to 9 U.S.C. § 10) by manifestly disregarding the law in taking the step of effectively
re-writing the Tracking Systems-Xtria Settlement and ignoring conclusive evidence on the affiliate
issue. The authority of arbitrators is derived from the arbitration agreement and is limited to a
decision of the matters submitted therein either expressly or by necessary implication. Cameron Int'l
Corp. v. Vetco Gray Inc., No. 14-07-00656-CV, 2009 WL 838177, at *9 (Tex. App.--Houston [14th
Dist.] Mar. 31, 2009, no pet. h.) (mem. op.) (citing Gulf Oil Corp. v. Guidry, 160 Tex. 139, 143, 327
S.W.2d 406, 408 (1959)). Arbitrators exceed their powers when they decide matters that are not
before them. Barsness v. Scott, 126 S.W.3d 232, 241 (Tex. App.--San Antonio 2003, pet. denied). 
Xtria has not argued the arbitrator in this case decided a matter that was not before him. Thus, not
only was Xtria's argument waived, it was without merit. Graham-Rutledge & Co. v. Nadia Corp.,
No. 05-07-01579-CV, 2009 WL 866206, at *5 (Tex. App.--Dallas Apr. 1, 2009, no pet. h.)
(rejecting argument that arbitrator exceeded her powers when she "rewrote the lease contract
between the parties" since it was ambiguous); Cameron Int'l Corp., 2009 WL 838177, at *9 ("A
complaint that the evidence does not support the arbitrator's award, however, is not a complaint that
the arbitrator exceeded his powers.").
15. In fact, the federal court even stated the arbitrator did not make a finding on the affiliate
issue. Xtria L.L.C., 2008 WL 4692855, at *6. 



nt.  This dismissal may be with prejudice.

 

(e)
An order granting or denying a motion for dismissal is immediately appealable
as an interlocutory order.

 

                        .
. . .

 

(g)
This statute does not apply to any suit or action for the payment of fees
arising out of the provision of professional services.

 

Act of May 18, 2005, 79th Leg.,
R.S., ch. 208, § 2, 2005 Tex. Gen. Laws 369, 370 (amended 2009) (current
version at Tex. Civ. Prac. & Rem.
Code Ann. § 150.002(a), (b) (West 2011) (emphasis added).

            Wood filed
suit on October 2, 2007.  Sanders filed a
counterclaim alleging that Wood had breached his contract (failure of
consideration) by developing plans that were economically unfeasible and
were not the quality of services to which he was entitled and for which he
paid.  Sanders argues he was not
required to file a certificate of merit because he has brought non-negligence
claims arising out of engineering fees.  

            Wood argues
that we should follow the first part of the first paragraph of the statute,
while disregarding other portions of the statute.  Section (a) of the statute requires a
certificate of merit for any action, for damages, arising out of the provision
of professional services by a licensed or registered professional.  He then alternatively argues that we should
disregard the final paragraphwhich contains the dispute over fees language,
and find that the trial court abused its discretion by failing to dismiss the
entire Sanders counterclaim.  

            B.        Authorities
 

 

            This Court
and the majority of Texas Courts of Appeals that have addressed whether Section
150.002 requires a certificate of merit only in relation to negligence claims
have held that (in the version applicable between September 1, 2005 and August
31, 2009) the statute required the affidavit only in cases involving negligence
or claims based on negligent acts.  Natex Corp., 326 S.W.3d at 733; see also Curtis & Windham Architects,
Inc. v. Williams, 315 S.W.3d 102, 108 (Tex. App.Houston [1st Dist.] 2010,
no pet.); Parker County Veterinary Clinic
v. Batenhorst, Inc., No.
02-08-380-CV, 2009 WL 3938051, at *3 (Tex. App.Fort Worth Nov. 19, 2009, no
pet.) (mem. op.); Landreth v. Las Brisas
Council of Co-Owners, Inc., 285
S.W.3d 492, 500 (Tex. App.Corpus Christi 2009, no pet.); Kniestedt v. Sw. Sound & Elecs., Inc., 281 S.W.3d 452,  455 (Tex.
App.San Antonio 2007, no pet.).  

            The Austin court
has recently reversed its own prior opinion and held otherwise.  S &
P Consulting Engrs v. Baker, 334 S.W.3d 390, 404 (Tex. App.Austin 2011,
no pet.).  Relying on the 2009 legislative
history to read into the intent of the 2005 and 2009 amendments, the Austin
Court in S & P Consulting Engineers overruled its own previous
opinion by holding that a certificate of merit is required in any action for
damages arising out of the provision of professional services by a design
professionalnot just in actions alleging negligence.  334 S.W.3d at 404.  In doing so, it decided that the application
of the rules of grammar to the negligent act, error or omission language in
(a) was inappropriate when that application did not appear to be consistent
with the result desired by the first sentence of (a) (proceeding out of the provision
of professional services).  

            This
disagreement stems from the 2005 amendments made to the statute.  The amendment removed language from Section
150.002(a) explicitly limiting the certificate of merit requirement to actions
alleging professional negligence and requiring a certificate in any action or
arbitration proceeding for damages arising out of the provision of professional
services.  Act of May 18, 2005, 79th
Leg., R.S., ch. 208, § 2, 2005 Tex. Gen. Laws 369, 370 (amended 2009); S & P Consulting Engrs, 334 S.W.3d
at 399.  However, the legislature left
unchanged the language of Section 150.002(a) requiring the certificate to
allege at least one negligent act, error, or omission.  Act of May 18, 2005, 79th Leg., R.S., ch. 208,
§ 2, 2005 Tex. Gen. Laws 369, 370 (amended 2009); S & P Consulting Engrs, 334 S.W.3d at 399.  The Parker
County court made a compelling argument for applying the law only to
negligence claims by pointing out that requiring a certificate setting forth at
least one negligent act, error, or omission where there is no negligence claim
would require an affidavit that had no relevance to the suit and would render
the statute meaningless.  2009 WL
3938051, at *3.  The S & P Consulting Engineers court chose to rectify this apparent
contradiction by disregarding a grammatical rule of construction and deciding
that the adjective negligent only modified act, rather than act, error, or
omission in Section 150.002(a).  334
S.W.3d at 403 (allowing a certificate to delineate either a negligent act or
in a non-negligence case the error or omission).  This allowed the court to reconcile the
conflict between the apparent meaning of the plain language and what that court
believed the Legislature intended.  Id. 

            We find the Austin courts reasons
for the reversal of its position unpersuasive. 
We will not utilize the legislative history for a later statutory
amendment to determine why an earlier, different Legislature had taken a
particular act.  We also note that the
rules of grammar, in a profession based upon the use of words, are neither
unimportant nor to be ignored.  We
therefore continue to hold that under the September 1, 2005, version of the
statute, the certificate of merit requirement applies only to negligence
claims.  Natex Corp., 326 S.W.3d at 733. 


            C.        Does
the Counterclaim Involve Tort or Contract?

 

            This Court,
following precedent from other Texas appellate courts, has held that this
statute applies only to negligence claims and not to claims based on contract.  Id.   If
this statute does not apply, Sanders was not required to file a certificate of
merit and his counterclaim should be allowed to proceed in its entirety.  The question before us is whether the
allegations in Sanders counterclaim are based on the negligence of Wood or only
on contractual obligations.  

            We do not
address this issue in a vacuum.  The Texas
Supreme Court has repeatedly analyzed the distinction between torts and
contracts.

            Over
the last fifty years, this Court has analyzed the distinction between torts and
contracts from two different perspectives.  At first, we merely analyzed the source of the
duty in determining whether an action sounded in tort or contract. For
instance, in International Printing
Pressmen & Assistants Union v. Smith, 145 Tex. 399, 198 S.W.2d 729,
735 (Tex. 1946), this Court held that an action in contract is for the breach
of a duty arising out of a contract either express or implied, while an action
in tort is for a breach of duty imposed by law. Id. (quoting 1 C.J.S. Actions § 44).

 

            Later,
we overlaid an analysis of the nature of the remedy sought by the plaintiff.  In Jim
Walter Homes, Inc. v. Reed, 711
S.W.2d 617 (Tex. 1986), we recognized that, while the contractual relationship
of the parties could create duties under both contract law and tort law, the nature
of the injury most often determines which duty or duties are breached.  When the injury is only the economic loss to
the subject of a contract itself, the action sounds in contract alone.  Id.
at 618.  Because a mere breach of
contract cannot support recovery of exemplary damages, and because the
plaintiffs did not prove a distinct tortious injury with actual damages, we
rendered judgment that the plaintiffs take nothing on their exemplary damages
claim.  Id.

 

Formosa Plastics Corp.
v. Presidio Engr, 960 S.W.2d 41, 45 (Tex. 1996). 

 

            The result
provides two factors to review in determining the nature of an action.  Under Formosa,
we consider (1) the source of the duty owed to plaintiff (was it based merely
on the contract and (2) the nature of the remedy sought (economic loss to the
subject of the contract means the action sounds in contract). 

            In
Natex, the Paris Independent School District
(PISD) contracted with Natex to prepare architectural designs for renovations
and new construction of school buildings. 
Written contracts were entered on each of the seven buildings and a new
stadium.  PISD gave Natex notice of
termination of the contracts for failure to provide documents for approval,
failure to provide a schedule, and for requests for payment for which it was
not entitled.  PISD filed suit alleging
Natex had breached the contracts.  PISD
alleged various violations of the contracts and the plans produced were unusable.
 Natex,
326 S.W.3d at 733.  PISD later amended
its suitclearly adding negligence claimsand filed a certificate of merit at
that time.  Natex alleged PISD should have filed such
a certificate with the original suit.  In
Natex, we held that the requirement
of a certificate of merit applied only to negligence claims, not claims based
on contract.  Id. 

            In
determining whether PISD had an obligation to file the certificate with the
original petition, we undertook to decipher if the original claim was for
negligence or only for contractual violations. 
Natex argued that the original
petition alleged negligence actions when it asserted that the work of Natex was untimely and unusable.  We recognized that we were not bound by the
labels of the pleadings and looked to the body of the pleadings to determine
what the claim asserted.  Applying the Texas
Supreme Courts analysis, we looked to see whether the causes of action
asserted arose only from a violation of a duty imposed by law (tort) or from a
duty imposed by contract.  In that case,
the duty was imposed by contract.  Id. 


            In
our analysis, we recognized that a contractual relationship between the parties
may create duties under both contract and tort law, and the party may breach
either or both duties.  Id. (citing Parker County Veterinary Clinic, Inc., 2009 WL 3938051).  We
found that even though PISD alleged the plans were so untimely and unusable
and out of touch with the available budget that they could not be used, the
basic duty flowed from the contract between the parties.  We further discussed that the parties had a
written contract that governed and included specific provisions, whereas in Ashkar Engg Corp. v. Gulf Chem. &
Metallurgical Corp., No. 01-09-00855-CV, 2010 Tex. App. LEXIS 769
(Tex. App.Houston [1st Dist. ] Feb. 4, 2010) the parties had no written
contract, and no specific provision of a contract giving rise to specific
duties to adequately design, engineer, etc. were alleged.  (In Ashkar
the court held that the pleadings of contract violations included failing to
adequately monitor the work, failure . . . to properly supervise, or
properly test, which the court found mirrored the negligence claims).  The damages sought in Natex were consequential damages and attorneys fees recoverable in
a contract action.  The damages sought in
Ashkar were for repairs and
remediation, not economic loss related directly to the subject of the contract,
which suggested the claims did not sound in contract.  Id.
at *28.  So in Ashkar, the claims were for negligence and the failure to file the
certificate required dismissal.  Id. at *24.

            In this
case, there is no written contract.  The
complaint is similar to that in the Natex
case in that both allegations were that the plans as drawn were unusable and
were not economically feasible for the project. 
We recognize that a contractual relationship may create duties under both
contract and tort law.  In many cases,
the nature of the remedy is instructive. 
Natex, 326 S.W.3d at 734.  The allegations in the counterclaim were that
the plans by Wood made the proposed project economically unfeasible, which
required Sanders to hire another firm to revise the plans.  Sanders does not allege the plans were
prepared negligently or without due care, but that the plans were so
economically impractical as to be unusable for the project.  Woods performed the job based solely on the
agreement of the parties.  These
pleadings, even though there is no written contract, appear to be of a
contractual nature. 

            The second issue
is the nature of the remedy sought (economic loss to the subject of the
contract means the action sounds in contract). 
In Natex, we noted that the
damages sought were consequential damages for the increased costs of
construction due to the breach.  Id. at 730.  Here, we review the courts ruling based on
the pleadings and evidence before it at the time of the hearing, on January 13,
2011.  See City of Houston v. OFiel, No. 01-08-00242-CV, 2009 Tex. App.
LEXIS 630 (Tex. App.Houston [1st Dist.] Jan. 29, 2009, pet. denied) (mem. op.).  In the first amended counterclaim, Sanders
alleged that he and Wood had an agreement that he would prepare engineering and
surveying for the project and that after it was completed, the projected cost
as prepared was so high as to make the project economically unfeasible.  Sanders hired another firm, which revised the
plans (which were approved by the City), resulting in a $356,498.00 decrease in
the cost of the project.  A fair reading
of the counterclaim reflects that Sanders alleged the services provided under
the agreement were 

not the quality of services to which he was
entitled and for which he paid. Counter-Plaintiff had every reason to expect
that Counter-Defendants plans could be used for the proposed project and that
when used, the project would be economically feasible. 

 

Counter-Plaintiff has been damaged by having to
pay Dunn Engineering for services which he should not have had to pay.  His damages exceed $53,038.56 for which he
sues Counter-Defendant. 

 

            We find the
relief requested is based on an alleged breach of contract.  Although inartfully worded, the pleadings
quoted above seek recovery that could be based on a type of breach of warranty
(which is in this context clearly based upon the contractual agreement), a
failure of consideration, and a failure to provide the agreed-upon type of
plans.  The damages sought are
consequential damages of being required to employ an additional engineer to
prepare plans that allow the project to be economically feasible.[3]


            Thus, both
the source of duty and the type of relief sought are based in application of
contract law rather than tort law, and this action was therefore not properly
dismissible for failure to file a certificate of merit.  

            We
emphasize that we do neither by this opinion express any view as to the
ultimate terms of this apparent oral agreement as they may be proven to exist,
nor do we express any view as to which party (if either) may be able to recover
on their respective claims. 

            D.        Is This a Suit for Payment of Fees? 

 

            Section
150.002(g) has an explicit exception stating that a certificate of merit is not
required for lawsuits involving payment of fees arising out of the provision of
professional services.[4]  Wood and Sanders both appeal from the trial
courts ruling regarding the payment of fees exception.  The trial court found that Sanders
counterclaim was limited to an offset against 
Woods recovery.  Sanders argues
that the entire matter is a suit for the collection of fees for professional
services and therefore no certificate of merit is required.  Wood argues that the court erred in allowing
Sanders to assert any claim or offset.  

            If the suit
is one for the payment of fees, a certificate of merit is not required.  We have already concluded that the statute
does not require filing a certificate because the counterclaim involves
contractual claims, not negligence. 
Therefore, Sanders was not required to file a certificate of merit
regardless of whether this case is classified as a suit over the payment of
professional fees or not.  Consequently,
we do not address that issue.  

            We reverse the trial
courts order limiting Sanders counterclaim as an offset only and remand for
further proceedings consistent with this opinion.

 

                        

 

                                                                                    Jack
Carter

                                                                                    Justice

 

Date Submitted:          July
27, 2011

Date Decided:             August
12, 2011

 











[1]We
note that a number of other matters are also posed which may not be reached by
this Court in this appeal from the ruling on jurisdiction.  Sanders filed an amendment to his answer and
counterclaim adding a claim for slander of title based on a mechanics and materialmens
lien filed on the title by Wood.  Both
parties agree that the slander of title claim is not subject to the certificate
of merit requirement.  

  





[2]City of Dallas v. First Trade Union Sav.
Bank, 133 S.W.3d 680, 686 (Tex. App.Dallas 2003, pet. denied) (holding
that, in interlocutory appeal regarding citys plea to the jurisdiction, court
could not address citys argument that banks claims against city failed as a
matter of law because court may not reach the merits of the claims in
determining plea to the jurisdiction).  





[3]When
the injury is only the economic loss to the subject of a contract itself, the
action sounds in contract alone.  Jim Walter Homes, Inc. v. Reed, 711
S.W.2d 617, 618 (Tex. 1986).

 





[4]Woods
lawsuit against Sanders is couched solely as an attempt to obtain fees due but
unpaid, and is based on their contract. 
Although some types of potential relief under equitable theories of relief
are set out, they all revolve around the attempt to recover his fees under some
theory of law.